Rochelle Chronister, Secretary Kansas Department of Social and Rehabilitation Services 915 S.W. Harrison Street Topeka, Kansas 66612
Dear Secretary Chronister:
You request our opinion concerning 1997 Senate Bill No. 140. Your Department has advised us that this bill was designed to implement Title III of the federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) which is designed to tighten existing child support collection endeavors. The bill establishes a state directory of new hires and establishes new administrative procedures for ordering paternity testing, enforcing child support orders and collecting child support arrearages, including administrative levies on real and personal property. In an attempt to locate parents who are dilatory in paying child support, cable television companies, public utilities and financial institutions are required to provide information about the parent and the parent's assets and/or liabilities. We are advised that failure to implement Title III could result in the loss of $29.3 million for the state.
Some members of the legislature are concerned that 1997 Senate Bill No. 140 violates provisions of the Kansas Bill of Rights (see 1997 Senate Concurrent Resolution No. 1612) and this is the impetus for your opinion request. However, before we address your specific questions, we believe that a brief history of federal and state efforts to collect child support is helpful in order to understand the genesis of this proposed legislation.
Prior to 1967, the methods of enforcement and implementation of child support orders were left to the discretion of the individual states. Kansas Enacts NewProvisions for Child Support Enforcement-Mandatory WageWithholding, 25 Wn.burn L. J., 91, 94 (1985). State efforts to collect child support were unsuccessful and, as a result, the number of children receiving support under the Aid to Families with Dependent Children Program (AFDC) increased dramatically. Rute, TheTightening Web: Child Support Enforcement, 63 J.K.B.A. p. 14 (October, 1994). In 1950, 34 of every 1000 children in the United States were receiving AFDC. Id. By 1975, the number had increased to 122 per 1000 — an increase of 72%. Id. By 1973, 83% of the families receiving AFDC benefits had one parent absent and were not receiving support from that parent sufficient to keep the family off assistance. Id.
Responding to the increase in AFDC recipients, Congress amended The Social Security Act in 1967 requiring states to initiate paternity actions and collect support on behalf of children receiving public assistance. Id. In 1974, Congress enacted amendments to the Social Security Act, adding Title IV, Part D, which provided federal funding to the states to cover part of the administrative cost of paternity establishment and child support enforcement. Id. Minimum standards were imposed upon state collection efforts, cooperation by AFDC recipients was mandated in most cases and non-AFDC recipients became eligible for assistance in obtaining enforcement of support orders.Id. The Child Support Enforcement Amendments of 1984 were Congress's next attempt to decrease the number of AFDC recipients. This legislation required intercepts of state tax refunds, mandated states to establish discretionary child support guidelines and procedures for expeditious processing of cases and provided incentive payments for collection of non-AFDC as well as AFDC support obligations. Id.
The federal Family Support Act of 1988 mandated more stringent wage withholding provisions by requiring withholding even where there was no arrearage and allowed the use of social security numbers to establish the identity of parents. Id. Congress addressed the problem of collecting child support in two more legislative enactments [Child Support Recovery Act of 1992 and the Omnibus Reconciliation Act of 1993] before passing the 1996 Welfare Reform Act which generated the mandate that 1997 Senate Bill No. 140 was drafted to address.
Under current state law, the Kansas Department of Social and Rehabilitation Services (SRS) is the agency designated under Title IV-D to collect child support, but the court trustee office is also authorized to enforce child support obligations. K.S.A. 23-492 etseq. AFDC recipients are required to assign their child support rights to SRS and SRS can then institute a civil action to establish parentage and enforce child support. [SRS can also initiate such actions on behalf of non-AFDC recipients]. K.S.A. 1996 Supp. 39-709(c), K.S.A. 1996 Supp. 39-755; K.S.A. 39-756; K.S.A. 1996 Supp. 38-1115. SRS or its contractor can apply to the court for income withholding orders which require an employer to withhold income to satisfy a child support order. K.S.A. 23-4,105 et seq. K.S.A. 23-4,147 directs SRS to establish a system for disseminating information and advice to individuals seeking assistance in enforcing support orders and K.S.A. 39-753 requires SRS to establish a parent locator registry. State, county and local units of government are required to assist SRS by providing information concerning the location, employment status, income, date of birth and social security number of an absent parent. K.S.A. 39-758. SRS can provide arrearage information to credit reporting agencies and a court may restrict a parent's driver's license if he or she is found guilty of contempt in a child support enforcement proceeding. K.S.A. 23-4,145; K.S.A. 1996 Supp. 20-1204a. Moreover, licensing entities may take disciplinary action against a professional licensee if the latter has been found in contempt in a child support enforcement proceeding. K.S.A. 1996 Supp. 74-146.
With this background in mind, we now address your queries:
1. Does 1997 Senate Bill No. 140 violate Section 15 ofthe Kansas Bill of Rights as it relates to Sections 4and 73 (access to records), Section 6 (social securitynumbers on certain applications), Sections 8 through 24(administrative procedures), Section 34 (liens onpersonal property), and Section 76 (liens on realproperty)?
a. Do Sections 4 and 73 (access to records) violateSection 15 of the Kansas Bill of Rights?
1997 Senate Bill No. 140 authorizes SRS to subpoena information concerning the location of parents and their assets and liabilities from a variety of sources. An employer must provide information regarding the employment, compensation and benefits of its employees and contractors. Section 4(b). Public utility and cable television companies must provide customers' names and addresses as well as those of customers' employers as reflected in such records. Section 4(c). Financial institutions must disclose information about a parent or the parent's property and liabilities. Section 4(d). State, county and local units of government are already required to cooperate with SRS in locating absent parents by providing information about location, employment status, date of birth and social security number as well as any information concerning medical or health insurance coverage for a dependent. K.S.A. 39-758. Section 73(a) of Senate Bill 140 amends K.S.A. 39-758 by requiring governmental entities to provide information concerning the location of a parent's assets. Finally, SRS or its designee can obtain information from records of the Department of Revenue concerning the person who has a duty of support. Section 73(c). Information gathered by SRS is confidential and is available only to persons authorized to receive such information. Sections 4(f), 73(d). Violation of these confidentiality provisions is a class B nonperson misdemeanor. K.S.A.39-759, as amended by 1997 S. B. No. 140, § 74(a).
Section 15 of the Kansas Bill of Rights guarantees the "right of the people to be secure in their persons and property against unreasonable searches and seizures." Section 15 is identical to the wording of theFourth Amendment to the United States Constitution. State v.Tinsley, 16 Kan. App. 2d 287 (1992).
The first step in reviewing a potential violation of Section 15 or the Fourth Amendment is to determine whether a person has a reasonable expectation of privacy in the items disclosed to the government. Smith v.Maryland, 442 U.S. 731, 61 L.Ed.2d 220, 99 S.Ct. 2577
(1979). In that vein, the United States Supreme Court and the Kansas Supreme Court have concluded that a person has no expectation of privacy in records pertaining to that individual which are held by a financial institution or a telephone company because the customer knows and expects that others will see the records. State v. Schultz, 252 Kan. 819 (1993),Southwestern Bell Telephone Company v. Miller,2 Kan. App. 2d 558 (1978), United States v. Miller,425 U.S. 435, 48 L.Ed.2d 71, 96 S.Ct. 1619 (1976); Smithv. Maryland, supra.
 "In United States v. Miller (citation omitted), the United States Supreme Court reasoned that a bank depositor had no reasonable expectation of privacy in bank records because the documents were the bank's business records, not the depositors `private papers.' The court stated: `the checks are not confidential communications but negotiable instruments to be used in commercial transactions. All of the documents obtained, including financial statements and deposit slips, contain all information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business. . . .
 "`The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the government. [Citations omitted.] This court has held repeatedly that the fourth amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed. [Citations omitted.]'
 "In Southwestern Bell Telephone Co., the Kansas Court of Appeals stated the Miller decision `establishes that bank customers have no fourth amendment interest in their records, so that such records could be lawfully obtained by a grand jury through subpoena duces tecum addressed to a bank. We would suppose that this disposes of any claim which might be made by telephone customers.'" 252 Kan. at 823.
Using the same rationale, a federal district court in Wyoming found no legitimate expectation of privacy in a utility company's records. United States v. Porco,842 F. Supp. 1393 (D.Wy. 1994). Finally, in Donaldsonv. United States, 400 U.S. 517, 27 L.Ed.2d 580,91 S.Ct. 534 (1971), the court concluded that an employee has no reasonable expectation of privacy in the employment records held by an employer.
In short, it appears that an individual has no reasonable expectation of privacy as against the government in the records held by the various entities identified in Sections 4 and 73 of 1997 Senate Bill No. 140 and, therefore, these sections do not violate Section 15 of the Kansas Bill of Rights.
b. Does Section 6 (social security numbers on licenseapplications) violate Section 15 of the Kansas Bill ofRights?
Section 6 of 1997 Senate Bill No. 140 requires that the social security numbers of individuals applying for professional licenses, occupational licenses or marriage licenses be recorded on the license application. Kansas statutes are replete with the requirement that a person disclose a social security number. See, e.g., K.S.A. 1996 Supp. 65-2409a(f) (parents required to furnish social security number when birth certificate is filed unless an exemption applies); K.S.A. 1996 Supp. 8-240(c) (application for commercial driver's license must include applicant's social security number); K.S.A. 17-2256
(an agent of a guarantee corporation who writes contracts guaranteeing shares of credit union members must provide social security number to the credit union administrator); K.S.A. 23-4,108 (payor in an income withholding procedure is obligated to supply the social security number of an obligor); K.S.A. 40-2508 (a person desiring to register with the state insurance commissioner as an automobile club agent must supply social security number); K.S.A. 59-2130 (petition for adoption must contain the social security number of the child's parents); K.S.A. 60-717 (garnishment orders must include the defendant's social security number); K.S.A.65-1815 (applicant for barber's license must supply social security number); K.S.A. 65-2422b (information regarding divorces that is filed with the Register of Vital Statistics must contain the parties' social security numbers); K.S.A. 74-139 (all applicants for state licenses must provide social security numbers).
Section 15 of the Kansas Bill of Rights addresses unreasonable searches and seizures. A seizure of property is some meaningful interference with an individual's possessory interest in property. 68 Am.Jur.2d Searches and Seizures, § 7. A search occurs when an expectation of privacy that society considers reasonable is infringed. Id. 42 U.S.C. § 666(a)(13) requires that states obtain social security numbers from applicants for the types of licenses mentioned in Section 6 of 1997 Senate Bill No. 140. Given the plethora of laws that require disclosure of one's social security number, it is our opinion that an individual has no reasonable expectation of privacy in his or her social security number as against the government when applying for a professional, occupation, or marriage license. Consequently, there is no violation of Section 15 of the Kansas Bill of Rights.
c. Do Sections 8 through 24 (administrativeprocedures) violate Section 15 of the Kansas Bill ofRights?
Sections 8 through 24 allow the Secretary of SRS to obtain access to information as authorized by law, subpoena records, order genetic tests, order minimum payments to defray arrearages and enforce support duties by income withholding, administrative levy and executions against property. Section 10(d) allows the Secretary to conduct investigations into the existence of the parent and child relationship and the location of a parent and the parent's assets. The Secretary may also initiate, modify and enforce income withholding orders and otherwise enforce support orders by administrative remedies provided by law. Section 10(d)(5)(6). The mechanism to accomplish these objectives is through administrative hearings governed by the Kansas Administrative Procedures Act (KAPA), K.S.A. 77-501 et seq. and the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601et seq. 1997 S. B. No. 140, §§ 13, 14, 15 and 21.
Section 15 of the Kansas Bill of Rights addresses unreasonable searches and seizures. Sections 8 through 24 of Senate Bill No. 140 create administrative procedures that enable SRS to take action. There may be Section 15 issues regarding the manner employed by SRS or its designees in conducting investigations and gathering evidence, but the resolution of those issues will be factual in nature and, therefore, we decline to speculate concerning whether particular proceedings initiated under Sections 8 through 24 violate Section 15 of the Kansas Bill of Rights.
d. Does Section 34 (liens on personal property) andSection 76 (liens on real property) violate Section 15of the Kansas Bill of Rights?
While you request our opinion concerning whether Sections 34 and 76 violate Section 15 of the Kansas Bill of Rights, we understand your inquiry to be whether theFourteenth Amendment's protection against the deprivation of property without due process of law is implicated.
Section 34 of 1997 Senate Bill No. 140 amends K.S.A.23-4,146 (Income Withholding Act) by creating a lien by operation of law upon certain personal property of an individual who owes child support arrearages. The person who is owed such support or SRS, by virtue of its assignment, may then perfect the lien by filing a notice as prescribed in the section.
In Connecticut v. Doehr, 501 U.S. 1, 115 L.Ed.2d 1,111 S.Ct. 2105 (1991), the United States Supreme Court concluded that state procedures for creating and enforcing attachments, as with liens, are subject to the strictures of due process. See Reardon v.United States, 947 F.2d 1509 (1st Cir. 1991) (lien on real property created by federal statute amounts to a deprivation of a significant property interest within the meaning of the Fourteenth Amendment's Due Process Clause); Cobb v. Saturn Land Co., 966 F.2d 1334 (10th Cir. 1992) (oil and gas liens constitute a deprivation of property sufficient to require procedural due process protections).
 "We agree . . . that the property interests that attachment affects are significant. For a property owner . . . attachment ordinarily clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chances of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause." 115 L.Ed.2d at 14.
In Cobb v. Saturn Land Co., supra, the 10th Circuit upheld an Oklahoma statute that created an oil and gas lien on a leasehold where the lienor had performed services or provided supplies. The lien statute required a public filing of the notice of lien, notice to the owner and a hearing on the merits, if requested. The court concluded that in light of the fact that the lienor already possessed a lien by operation of law, this "preexisting right in the encumbered property" heightened the creditor's interest that justified the summary enforcement procedures provided in the statute.
Before an income withholding order can issue, there must first be an underlying order of support issued by a court or an administrative agency which contains a finding that the obligor owes a duty of support and the amount that is due. Such a procedure, whether conducted in a divorce setting or a paternity hearing, requires notice to the obligor and an opportunity to be heard. K.S.A. 60-1610; K.S.A. 38-1117. Support orders issued or modified after January 1, 1986 contain income withholding provisions which require a payor to withhold income to satisfy an arrearage. However, prior to initiating a withholding order, notice and an opportunity to contest the withholding is provided to the obligor before the withholding order issues. K.S.A.23-4,107. If the original support order does not contain an income withholding provision, either the court or SRS may issue the order after notice and an opportunity to contest the withholding has been offered to the obligor. Sections 15(c),19, 21, 27, 30. [S.B. 140, Section 27 amends K.S.A. 23-4,107 by requiring new support orders and modifications of support orders to contain income withholding provisions that provide for immediate issuance without further notice to the obligor.]
Under the proposed amendment to the Income Withholding Act, a lien will not arise under an income withholding order until there is an arrearage in a certain amount. Section 34. The obligee is required to provide notice of the lien to the obligor and the latter may request a hearing. Section 34(a)(4). Consequently, it is our opinion that Section 34 creates a preexisting right to certain personal property of a parent who is in arrears on a child support obligation and the due process procedural protections that are afforded to such parent comport with the Fourteenth Amendment.
Section 76 amends K.S.A. 60-2202 [which provides that any judgment rendered by a district court in the state of Kansas creates a lien on the debtor's real estate in the county in which the judgment is rendered] by allowing unpaid child support arrearages accruing under a support order issued in another state that would give rise to a lien on real property in that state to become a lien on the obligor's real estate located in the state of Kansas when the notice of lien is filed in the county where the property is located. Unlike the procedural protections afforded by Section 34 with regard to certain personal property, Section 76 contains no provisions for notice and an opportunity to contest the lien. Consequently, to the extent adequate due process proceedings are not available in the state where the lien arises, that portion of Section 76 which allows a lien from another state to become a lien on real property in this state violates the Fourteenth Amendment.
2. Is the right of privacy violated by Sections 4 and73 (access to records), Section 6 (social securitynumbers on certain applications), Section 8 through 24(administrative procedures), Section 34 (liens onpersonal property) and Section 76 (liens on realproperty)?
a. Do Sections 4 and 73 (access to records) violate aright of privacy?
While the Constitution does not explicitly establish a right of privacy, the Supreme Court has recognized for nearly 100 years that a right of personal privacy does exist. Eastwood v. Dept. of Corrections of State ofOklahoma, 846 F.2d 627 (10th Cir. 1988). In a series of cases, the court established a zone of privacy protected by the penumbra of a variety of provisions in the United States Constitution. [The roots of the right of privacy have been found in the First Amendment, Stanley v.George, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542
(1969); the Fourth and Fifth Amendments, Terry v. Ohio,392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); the general penumbra of the Bill of Rights, Griswold v.Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510
(1965); and in the Fourteenth Amendment's concept of personal liberty and restriction upon state action, Roev. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147
(1973)]. This penumbra protects two kinds of privacy interests: the individual's interest in avoiding disclosure of personal matters and the interest in being independent when making certain kinds of personal decisions. Whalen v. Roe, 429 U.S. 589, 599,97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The first interest protects the individual from governmental inquiry into matters in which it does not have a legitimate and proper interest. "The right to be left alone" is "the right most valued by civilized men." Olmstead v.United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed.2d 944
(1928).
Sections 4 and 73 require individuals and entities to provide information to SRS concerning the location of a parent who owes child support, the nature of the parent's assets and liabilities and the location of such assets. The seminal case on the issue of disclosure of personal information to the government by third parties is Whalenv. Roe, supra. In Whalen, the court upheld a New York statute that required physicians to provide to the state copies of prescriptions for certain designated drugs. The prescription contained the doctor's name, the drug and its dosage and the name, address and age of the patient. The information was recorded in a central computerized file with strict regulations designed to protect the patient's identity. The United States Supreme Court found that the state had a vital interest in controlling the distribution of dangerous drugs and that the privacy concerns were ameliorated by the strictures on disclosure.
In Skinner v. Railway Labor Executive Association,489 U.S. 602, 103 L.Ed.2d 639, 109 S.Ct. 1402 (1989), transportation employees subject to drug testing were required to disclose in writing whether they had taken any medications during the preceding thirty days in order to ascertain whether an employee's positive drug test result could be explained by the lawful use of medications. The written disclosures were collected by the employer and provided to government regulators. Citing Whalen, the court found no invasion of privacy in the absence of evidence that the government did not treat the information as confidential or that it used the information for any other purpose. See also Shanev. Buck, 658 F. Supp. 908 (D.Utah 1985), affirmed,817 F.2d 87 (10th Cir. 1987) and Kuzman v. United StatesPostal Service, 798 F.2d 29 (2d Cir. 1986) where the court upheld the validity of a United States Postal Service regulation that required a private mail forwarding service to supply to the government information concerning its customers. Supplying one's name and address to the Postal Service was not a disclosure of personal matters likely to establish a constitutional deprivation.
The lesson of Whalen and its progeny is that the right of privacy encompasses an individual's interest in avoiding the disclosure of personal matters but when confronted with such disclosure, the court will uphold a scheme where the state has articulated a legitimate need for the information and there are sufficient safeguards to protect the confidentiality of the information.
 "A final word about issues we have not decided. We are not unaware of the threat to privacy implicit in the accumulation of vast of amounts of personal information in computerized data banks or other massive government files. The collection of taxes, the distribution of welfare and social security benefits, the supervision of public health and the direction of our armed forces and the enforcement of the criminal laws, all require the orderly preservation of great quantities of information, much of which is personal in character and potentially embarrassing or harmful if disclosed. The right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures." 51 L.Ed.2d at 77.
It is our opinion that the provisions of 1997 Senate Bill No. 140 relating to the disclosure of information by third parties to SRS do not violate a right of privacy because the information at issue here serves a legitimate state interest in locating parents who owe child support. Such information is regarded as confidential and a person who discloses the information to unauthorized individuals is subject to the criminal penalties of K.S.A. 39-759, as amended by 1997 S.B. 140, § 74. 1997 Senate Bill No. 140, § 4(f).
b. Does Section 6 (social security numbers on certainapplications) violate a right of privacy?
Section 7 of the Federal Privacy Act of 1974 [5 U.S.C.S. § 552a note] does not prohibit disclosure of social security numbers but generally makes it unlawful for a state or local governmental agency to deny an individual any right or benefit provided by law because of the individual's refusal. However, it is not unlawful if disclosure is required by federal statute.42 U.S.C. § 666(a)(13) requires that states obtain social security numbers from applicants for the type of licenses mentioned in Section 6 of 1997 Senate Bill No. 140 so it is not unlawful for the state to require an applicant for such licenses to disclose the applicant's social security number. Consequently, we find no violation of a federal statutory right of privacy.
c. Do Sections 8 through 24 (administrativeprocedures), Section 34 (lien on personal property) andSection 76 (lien on real property) violate a right ofprivacy?
Virtually, every governmental action interferes with personal privacy to some degree. Katz v. United States,389 U.S. 347, 19 L.Ed.2d 576, 88 S.Ct. 507 (1967). The question in each case is whether that interference violates a command of the United States Constitution.Katz, supra. Sections 8 through 24 create an administrative procedure designed to allow SRS to conduct investigations into the parent and child relationship, the location of parents and their assets and to enforce support orders by income withholding, administrative levy and execution against property.
As indicated previously, the right of privacy exists in the penumbra of several constitutional provisions. Whether a right of privacy is violated by the administrative procedures at issue here will depend upon whether there is a violation of one of those provisions. We cannot speculate on which constitutional provision, if any, may apply to the numerous provisions of 1997 Senate Bill No. 140 and, therefore, we decline to opine whether Sections 8 through 24 violate any of the provisions of the United States Constitution that create a right of privacy.
Liens on personal and real property do not generally raise issues concerning privacy rights and are better analyzed under the Fourteenth Amendment to the United States Constitution. [See Section 1(d).]
3. Do Sections 8 through 24, concerning administrativeprocedures of 1997 Senate Bill No. 104 violate theseparation of powers doctrine?
Like the Constitution of the United States, the Kansas Constitution contains no express provision establishing the doctrine of separation of powers. However, it has been recognized that the very structure of the three branch system gives rise to the doctrine. State ex rel,Stephan v. Kansas House of Representatives, 236 Kan. 45,59 (1984).
 "The basic meaning of the separation of powers doctrine is that the whole power of one department should not be exercised by the same hands which possess the whole power of either of the departments. [Citations omitted]. It does not necessarily follow, however, that an entire and complete separation is either desirable or was ever intended by the framers of the Constitution. The fact that the powers of one department may overlap with another department's powers has longed been a recognized fact. Throughout the judicial history of this state early decisions attempted to apply the doctrine strictly, refusing to tolerate any overlapping of powers. [Citations omitted]. The more recent cases have modified the doctrine, taking a more pragmatic, flexible and practical approach giving recognition to the fact that there may be a certain degree of blending or admixture of the three powers of government and that absolute separation of powers is impossible." Leek v. Theis, 217 Kan. 784 (1975).
When a statute is challenged under the doctrine of separation of powers, the Court must search for a usurpation by one department of the powers of another department on the specific facts and circumstances presented. Leek, supra. A usurpation of powers exists when there is a significant interference by one department with the operations of another department.State, ex rel. v. Bennett, 219 Kan. 285 (1976). In determining whether or not a usurpation of powers exists a court should consider (a) the essential nature of the power being exercised; (b) the degree of control by one department over another; (c) the objective sought to be obtained by the legislature; and (d) the practical result of the blending of powers as shown by actual experience over a period of time. Bennett, supra.
Presently, it is the district court that issues child support judgments and income withholding orders. K.S.A. 1996 Supp. 60-1610; K.S.A. 23-4,105 et seq. The district court may also order genetic testing and determine paternity. K.S.A. 1996 Supp. 38-1118. Sections 8 through 24 of 1997 Senate Bill No. 140 provide an administrative scheme that is parallel to the court process in that SRS or its designees may subpoena records, order genetic testing, order payments to defray child support arrearages, enforce income withholding orders, enforce support duties by administrative levy, and order execution on property. Section 10.
Under the separation of powers doctrine, we must determine whether the executive department is significantly interfering with the power of the judiciary by implementing an administrative procedure that is designed to expedite the identification of parents who owe child support, the location of their assets and the collection of those support obligations. Over the years the district courts and SRS have joined forces to collect child support obligations. In 1972, the Office of the Court Trustee was established for the purpose of performing support enforcement duties. K.S.A. 23-492 et seq. The court trustee, with the approval of the administrative judge, may issue subpoenas, summonses, administer oaths and take sworn testimony, appoint special process servers and enter into stipulations, acknowledgments, agreements and journal entries, subject to approval of the court. K.S.A. 23-496. The Office of Judicial Administration and the Secretary of SRS are required to cooperate in designing legal forms and informational materials which describe the procedures and remedies under the Income Withholding Act. K.S.A. 23-4,117. Moreover, the Judicial Administrator of the courts and the Secretary of SRS are required to contract with each other to develop and maintain an automated management information system which monitors support payments, maintains accurate records of support payments and permits prompt notices of arrearages in support payments. K.S.A. 23-4,117. The Secretary of SRS may contract with court trustees for enforcement services. K.S.A. 23-4,117.
A balloon amendment to Section 10 of 1997 Senate Bill No. 140 provides as follows:
 "Nothing in sections 8 through 24 . . . shall be construed as authorizing the secretary to enter an order to establish or modify an obligation for current support. Nothing in sections 8 through 24 . . . shall be construed as limiting or restricting the jurisdiction of the courts of this state."
Furthermore, the bill prohibits SRS from modifying a child support order or an income withholding order that has been issued by a district court. Sections 19, 20.
Any administrative order that is issued by SRS or its designees is subject to a hearing pursuant to KAPA with judicial review pursuant to K.S.A. 77-601 et seq. Sections 13, 14, 15. Any order issued by SRS can only be enforced by resort to the Act for Judicial Review and Civil Enforcement of Agency Actions at K.S.A. 77-624. So, ultimately, it is the courts who will be the final arbiters concerning contested administrative actions and the enforcement of orders issued by SRS.
Article 3, Section 1 of the Kansas Constitution, which vests judicial powers in the courts, was never intended to prevent the Legislature from conferring quasi-judicial powers on administrative agencies when necessary to enable them to carry out their functions.Behrman v. PERB, 225 Kan. 435 (1979). While the essential nature of the power sought to be exercised by SRS under the bill is quasi-judicial we can find no usurpation by SRS over the functions of the judiciary in the administrative procedures set forth in 1997 Senate Bill No. 140, especially in light of the existing cooperation between the courts and SRS in collecting child support and the legislative objective of expediting the enforcement of child support obligations. Consequently, it is our opinion that Sections 8 through 24 of 1997 Senate Bill No. 140 do not violate the separation of powers doctrine.
4. Does subsection (e) of Section 10 of 1997 SenateBill 140 concerning delegation of administrative powersto SRS employees and independent contractors violateArticle 2, Section 1 of the Kansas Constitution whichprovides that the legislative power is vested in theLegislature?
Subsection 10(e) allows the Secretary of SRS to designate SRS employees to exercise the powers of the Secretary in certain cases and to contract with private individuals to serve as agents in order to exercise the powers of the Secretary in Title IV-D cases. Those powers are enumerated in Section 10(b) and (d) and include, among other things, the power to obtain access to information, subpoena records, order genetic testing, determine arrearage amounts, perfect liens, order execution against property, enforce income withholding orders and investigate the location of a parent and the parent's assets.
Article 2, Section 1 of the Kansas Constitution provides that the legislative power is vested in the Legislature. Such power cannot be delegated to private individuals or entities. Gumbhir v. Kansas State Boardof Pharmacy, 228 Kan. 579 (1980). The issue that we must determine is whether Section 10(e) delegateslegislative power to private individuals. Legislative power includes the power to appoint and the authority to make rules and provide penalties for their breach.Gumbhir, supra; Sedlak v. Dick, 256 Kan. 779 (1995);Vakas v. Kansas State Board of Healing Arts, 248 Kan. 589
(1991); State v. Crawford, 104 Kan. 141 (1919); VanSickle v. Shanahan, 212 Kan. 426, 440 (1973). The powers enumerated in Section 10(b) and (d) do not appear to be legislative in nature. If anything, they are more in line with executive (i.e. administrative) or quasi-judicial functions. Article 2, Section 1 of the Kansas Constitution only encompasses legislative powers — not quasi-judicial functions. U.S.D. 279 v. Secretaryof Kansas Department of Human Resources, 247 Kan. 519
(1990). We understand that the quasi-judicial functions listed in Section 10 will be administered by SRS employees but that contractors may be retained to provide the administrative services associated with investigations and the collection of support. In short, there does not appear to be a delegation oflegislative authority to such contractors and, therefore, we find no violation of Article 2, Section 1.
5. Does 1997 Senate Bill No. 140 violate Section 12 ofthe Kansas Bill of Rights concerning forfeiture of anestate?
Section 12 of the Kansas Bill of Rights provides that "no conviction within the state shall work a forfeiture of an estate." Under the common law, when sentence was pronounced for a capital offense, the offender, by operation of law, forfeited his or her property to the King. 21 Am.Jur.2d Criminal Law § 616. Section 12 prevents such forfeiture when a person is convicted of a crime. Rosenberger v. Northwestern Mutual LifeInsurance, 182 F. Supp. 633 (D.C. Kansas 1960); UnitedStates v. Nichols, 841 F.2d 1485 (10th Cir. 1988). We fail to see how Section 12 is implicated in this proposed enactment because it does not deal with criminal convictions. Therefore, it is our opinion that 1997 Senate Bill No. 140 does not violate Section 12 of the Kansas Bill of Rights.
Summarizing, it is our opinion that 1997 Senate Bill No. 140, Sections 4 and 73 (access to records held by third parties) and Section 6 (social security numbers required on certain license applications) do not violate Section 15 of the Kansas Bill of Rights. Sections 8 through 24 (administrative procedures) allow the Secretary of the Kansas Department of Social and Rehabilitation Services (SRS) to obtain access to information, subpoena records, order genetic tests and enforce support duties by income withholding and administrative levy. There may be Section 15 issues regarding the manner employed by SRS in conducting investigations and gathering evidence, but the resolution of those issues will be factual in nature. Consequently, we decline to opine whether Sections 8 through 24 violate Section 15 of the Kansas Bill of Rights.
Section 34 (liens on personal property) creates a preexisting right to certain personal property of a parent who is in arrears on a child support obligation and the due process procedural protections that are afforded to such parent comport with theFourteenth Amendment to the United States Constitution. Unlike the procedural protections afforded by Section 34, Section 76 (liens on real property) contains no provisions for notice and an opportunity to contest the lien. Consequently, to the extent adequate due process proceedings are not available in the state of origin, that portion of Section 76 which allows a lien from another state to become a lien on real property in this state violates the Fourteenth Amendment.
Sections 4 and 73 (access to records held by third parties) do not violate a right of privacy because the information at issue here serves a legitimate state interest in locating parents who owe child support and their assets. Such information is regarded as confidential and a person who discloses the information to unauthorized individuals is subject to criminal penalties. Moreover, Section 6 (social security numbers required on certain license applications) does not violate a right of privacy because disclosure is required by federal law. Liens on personal and real property do not generally raise issues concerning privacy rights and are better analyzed under theFourteenth Amendment to the United States Constitution.
Sections 8 through 24 (administrative procedures) do not violate the separation of powers doctrine nor does Section 10(e) [Secretary of Department of Social and Rehabilitation Services (SRS) authorized to designate SRS employees and independent contractors to exercise the powers of the Secretary in certain cases] violate Article 2, Section 1 of the Kansas Constitution which prohibits delegation of legislative authority to private individuals.
Finally, Section 12 of the Kansas Bill of Rights which prohibits forfeiture of estate upon conviction does not appear to be implicated in 1997 Senate Bill No. 140.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Mary Feighny Assistant Attorney General
CJS:JLM:MF:jm