(583 P.2d 1042)
No. 50,125

SOUTHWESTERN BELL TELEPHONE COMPANY, *Appellee,* v. VERN
MILLER, DISTRICT ATTORNEY, 18TH JUDICIAL DISTRICT, *Appellant.*

Petition for review denied November 8, 1978.

Opinion filed September 15, 1978.

*Stuart W. Gribble,* assistant district attorney, *Kiehl Rathbun,* assistant district attorney, and *Curt T. Schneider,* attorney general, for the appellant.

*Jerry G. Elliott,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, for the appellee.

Before FOTH, C.J., SWINEHART and MEYER, JJ.

FOTH, C.J.: The sole issue in this case is whether the grant of authority to prosecuting attorneys conducting inquisitions under K.S.A. 1977 Supp. 22-3101(2) to issue "subpoenas" includes the authority to issue subpoenas *duces tecum.* We hold that it does.

The action was precipitated by a subpoena issued by the district attorney of the eighteenth judicial district (Sedgwick county) in connection with an investigation of alleged violations of the narcotics laws. The subpoena commanded the security manager of the Southwestern Bell Telephone Company to appear before the district attorney and bring with him all records in possession of Bell showing telephone numbers charged with making calls to certain telephone numbers in Kansas for a specified three month period.

The response from Bell was this suit for a declaratory judgment, seeking to enjoin the enforcement of this subpoena and the issuance of any more like it. The trial court, reading the statute as authorizing a subpoena for a witness to testify but not a subpoena *duces tecum,* granted the injunction prayed for. The district attorney has appealed.

K.S.A. 1977 Supp. 22-3101, the "inquisition" statute, has three subsections. The first applies to the investigation of any crime, and provides for subpoenas to be issued by a judge upon application by a prosecutor. Subsection (3) deals with taking testimony and provides that refusal to testify may be adjudged contempt of

court. Subsection (2), under which this subpoena was issued, authorizes subpoenas by the prosecutor, without the necessity of judicial action, in the investigation of certain specified crimes. It provides:

"(2) If the attorney general, assistant attorney general or county attorney of any county is informed or has knowledge of any alleged violation of [the statutes of] this state pertaining to gambling, intoxicating liquors, criminal syndicalism, racketeering, bribery, tampering with a sports contest, narcotic or dangerous drugs or any violation of any law where the accused is a fugitive from justice, he or she shall be authorized to issue subpoenas for such persons as he or she shall have any reason to believe have any information relating thereto or knowledge thereof, to appear before him or her at a time and place to be designated in the subpoena and testify concerning any such violation. For such purposes, any prosecuting attorney shall be authorized to administer oaths."

The case was submitted below on stipulated facts and the arguments of counsel. The trial court reached three conclusions of law:

"1.  K.S.A. 1977 Supp. 22-3101(2) confers specific authority upon the District Attorney to personally issue subpoenas to persons to appear before him and testify under oath. This specific authority cannot be broadened by judicial interpretation to include the power to issue a subpoena duces tecum.

"2.  This Conclusion in no way implies any restriction upon the power of the District Judge to issue subpoenas in an inquisition proceeding brought pursuant to K.S.A. 1977 Supp. 22-3101(1).

"3.  Plaintiff's allegations concerning the constitutionality of said statute becomes moot by virtue of this ruling."

On appeal the district attorney challenges the first conclusion. Bell relies solely on that conclusion; it filed no cross-appeal, and does not seek to support the judgment on any alternative ground or reasoning. Bell concedes it has the information sought. Hence we do not consider whether this particular subpoena was overbroad or oppressive, or whether it was issued in good faith for a legitimate law enforcement purpose. The parties are agreed that the judgment below must stand or fall on a pure question of statutory interpretation.

The parties devote a good deal of their briefs to the question of whether the civil code provisions for subpoenas are incorporated into the inquisition statute by virtue of references to them elsewhere in the code of criminal procedure. We do not find this discussion of much help in answering the question posed by this case, although we would probably agree with Bell that the inquisition statute stands on its own even though it is part of the

code of criminal procedure. The trial court apparently relied on the inquisition statute alone, and gave a strict construction to its language permitting subpoenas for "persons" to appear and "testify." Bell argues that such a construction is warranted because, it says, the statute is penal in nature, and because subpoenas *duces tecum* are specifically authorized elsewhere in the statute book.

The first argument we view as fallacious; the power to investigate crimes and issue subpoenas has nothing penal about it. The statutes defining crimes are obviously penal, and are strictly construed because people are entitled to fair notice of what conduct may subject them to penalties. Here, a contempt of court penalty may be imposed for failure to comply with the subpoena, but not for violation of the statute. The subpoena itself may be strictly scrutinized to see if there has been willful disobedience justifying punishment, but we do not see that as a reason to strictly construe the authorizing statute. If we must categorize it, we would think it a remedial statute which should be liberally construed to effectuate its purpose.

The second argument, invoking the doctrine of *expressio unius,* has more substance but does not convince us. It is true that under K.S.A. 50-153 the attorney general, when conducting an inquisition in antitrust cases, is specifically authorized to issue subpoenas *duces tecum.* However, the grand jury statute (K.S.A. 1977 Supp. 22-3008), enacted at the same time as our present inquisition statute as part of the 1970 code of criminal procedure, also speaks only of process to bring "witnesses to testify," and makes no mention of the production of documents. Likewise, subsection (1) of K.S.A. 1977 Supp. 22-3101, dealing with judicially supervised inquisitions, also speaks only of subpoenas for "witnesses" to "appear and testify." Yet we would suppose no argument would be made that subpoenas issued under either statute could not command the production of documents. Indeed, the court below in its second conclusion of law specifically recognized the right of a judge to issue subpoenas *duces tecum* under 22-3101(1), despite the fact that its language is no broader than that of 22-3101(2).

The only justification for distinguishing between the subpoena powers under the grand jury and judicial inquisition statutes on the one hand, and the prosecutorial inquisition statute on the

other, is to recognize and rely on the inherent right of courts to issue subpoenas—a right not possessed by prosecutors. While the authorities generally recognize that proposition, we doubt that the legislature chose its language with that in mind. It strikes us as more probable that in employing similar language in all three cases the legislature expected the power granted to be construed as being the same in all three.

As we see it, the real task in this, as in all statutory construction cases, is one of determining legislative intent. *Expressio unius* and all other "rules" of statutory construction are merely aids to assist in that chore, and are to be applied only where they are helpful in achieving that end. *Commerce Trust Co. v. Paulen,* 126 Kan. 777, 271 Pac. 388 (1928); *Harkrader v. Whitman,* 142 Kan. 186, 46 P.2d 1 (1935). In this case we are to determine simply whether the legislature intended a prosecutor who was conducting a criminal investigation to be able to compel the production of documents, or whether it meant to limit him to the interrogation of witnesses.

On this issue the district attorney makes an argument which we find compelling. There can be no doubt that the county prosecutors of this state, along with the attorney general, have a duty to investigate all criminal activity which comes to their attention, and that the inquisition statute is a primary tool entrusted to them by the legislature to assist in that function. *State, ex rel., v. Rohleder,* 208 Kan. 193, 490 P.2d 374 (1971); *State v. Brecheisen,* 117 Kan. 542, 232 Pac. 244 (1925). If information about criminal activity is in the hands of an individual, it can clearly be acquired by compelling that individual's testimony. If, as here, the information is in the hands of a corporation in the form of corporate records, the construction adopted below would mean it is beyond the reach of the official charged with the duty of investigating and prosecuting. We find it hard to believe the legislature intended the forces of law enforcement to go into the battle against crime with half their guns spiked.

As we read the cases cited by Bell, they stand for the proposition that agents of the executive branch (such as a county prosecutor or attorney general) have no subpoena power in the absence of express statutory authority. We have no quarrel with that general proposition. For example, in *State ex rel. Woodahl v. District Court,* 166 Mont. 31, 530 P.2d 780 (1975), the trial court

had declined the attorney general's request to convene a grand jury because, *inter alia,* it found he had statutory subpoena power under which he could accomplish the desired investigation. On this issue the Montana Supreme Court construed the applicable subpoena statute as applying only to cases actually pending in court, and held that a grand jury should be convened. The scope of such subpoenas was not in issue. The same kind of reasoning led the Georgia court to deny the subpoena power in *Williams v. Bolton,* 227 Ga. 671, 182 S.E.2d 440 (1971). There the attorney general was authorized to investigate the "affairs of any department" of state government. This was held not to include an investigation of individual wrongdoing by a single state employee. Again, the scope of the subpoenas was not considered. In the same vein, *Com. ex rel. Margiotti, Aplnt. v. Orsini,* 368 Pa. 259, 81 A.2d 891 (1951) holds that under the Pennsylvania Administrative Code the subpoena power was granted to administrative agencies (including the department of justice) only in connection with a hearing, and not a mere investigation.

Only one of Bell's cases bears directly on the question before us. In *Donatelli Bldg. Co. v. Cranston Loan Co.,* 87 R.I. 293, 140 A.2d 705 (1958), a city council committee issued a subpoena *duces tecum* under a statute authorizing it to "issue subpoenas to witnesses to testify" in any matter pending before it. The court held that the statutory grant extended only to subpoenas *ad testificandum,* and not to subpoenas *duces tecum.* Further, it held that a court could not lend its own subpoena power to assist an agency not possessing it. Although our research has been limited, the case is the only one we find which takes such a restrictive view of the extent of the subpoena power, once it is determined that the power exists.

Bell's final case on this subject, *In re McGowen,* 303 A.2d 645 (Del. 1973), does nothing for its position and in fact cuts the other way. There the attorney general had issued a subpoena *duces tecum* directing a news photographer to turn over a photograph to a policeman. The court held the subpoena should have been quashed because it did not comply with the authorizing statute, in that it was not returnable at the attorney general's office and was not issued as part of an attorney general's investigation.

The statute in question authorized the attorney general to "subpoena witnesses and evidence." The court saw no substan-

tial difference between this statute and its progenitor which had merely authorized process to "compel the attendance of witnesses." The court said:

"The purpose of this statutory grant of power was to 'confer upon the Attorney General, in the investigation of crime and other matters of public concern, powers similar to those inherent in grand juries', including the grand jury's power to 'compel the appearance of witnesses and the production of documents.' In re Hawkins, Del. Supr., 123 A.2d 113 (1956). The Statute was originally enacted in 1873. At that time, there were only two sessions of the grand jury each year. As explained by Chief Justice Southerland in *Hawkins:* (123 A.2d at 115)

" 'The legislature may well have thought it desirable to clothe the Attorney General, in the exercise of his prosecuting function, with full investigatory powers during the long vacations. (The original act of 1873 used the phrase "in vacation".) Whether or not this surmise be correct, it is clear that the general investigatory powers of the grand jury are now shared, at least to a substantial extent, by the Attorney General.'

"As further stated in *Hawkins,* the statutory grant *included the power,* in aid of investigations of suspected violations of the law, to *compel the production of documents* 'for examination by the Attorney General.' " (*Id.* at 647. Emphasis added.)

The *Hawkins* case, quoted in *McGowen,* dealt with whether the power to issue "process" for "witnesses" included the power to compel the production of documents. As noted, the answer was yes, the court saying:

"The phrase used in the quoted statute—'process to compel the attendance of witnesses'—naturally includes both kinds of subpoena, since both are designed to elicit from a witness facts in his possession, whether drawn from his memory or from his records. There is no significant difference in our practice between the right to issue a subpoena *ad testificandum* and the right to issue a subpoena *duces tecum.* Either issues as of course in any lawsuit, at the direction of counsel. Woolley, Delaware Practice, §§ 570, 573. Indeed, the form of the latter writ is identical with that of the former except that it includes an additional clause specifying the documents to be produced by the witness. Woolley, op. cit. § 573." (*In re Hawkins,* 123 A.2d 113, 115 [1956].)

New Jersey takes the same view as to the identity of the two types of process. In *Catty v. Brockelbank,* 124 N.J.L. 360, 12 A.2d 128 (1940), the court considered a statute dealing with proceedings in aid of execution, authorizing "process of *subpoena ad testificandum.* " The question was whether a subpoena under that statute could require the production of documents. Yet in the face of such apparently restrictive language the court held a subpoena *duces tecum* was authorized, observing:

"A *subpoena ad testificandum* does not lose any of its identity or its quality and

become something else because there is added thereto a clause of requisition to the witness to bring in certain records in his possession pertinent to 'the matters involved' without which the power of process to compel his testimony might well be valueless. Textwriters seem to take the position that the term *subpoena ad testificandum* is a technical and descriptive name for the ordinary subpoena. 60 C.J. 689; 70 C.J. 43, sec. 22G; and that a power to compel testimony by subpoena as a general rule connotes authority to include therein a *duces tecum* requirement. 70 C.J. 48, sec. 34. And it seems to me to be a sensible view. After all, the words 'sub poena' looking to the meaning, certainly have no relation whatever to process. Custom and tradition have, however, made the words synonymous with process of a certain kind. It is an erroneous view to my mind to hold that *subpoena duces tecum* is something different and apart from *subpoena ad testificandum* and that the latter term does not include the former. . . ." (*Id.* at 363.)

*Catty* was quoted approvingly in *In re Saperstein,* 30 N.J. Super. 373, 104 A.2d 842 (1954), in construing the subpoena provisions of the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings. The term there used was "summons," which was statutorily defined to include "a subpoena, order or other notice requiring the appearance of a witness." Relying on *Catty* and other cases of the same tenor, the court found a subpoena *duces tecum* was authorized, saying:

"In view of the earlier determinations of our courts on matters concerning somewhat similar statutes and the fact that the Uniform Act was enacted in aid of comity between states to assist the orderly and effectual administration of justice and prosecution of criminal conduct, we conclude that the Legislature, in enacting [the New Jersey statute] was aware of the case law holding the term 'subpoena' to embrace 'subpoena duces tecum' and intended no change in that viewpoint, else it would have been made by that body." (*Id.* at 379-80.)

(*Contra, In re Grothe,* 59 Ill. App. 2d 1, 208 N.E.2d 581 [1965].)

Finally, among foreign cases, we are impressed by *State ex rel. Pollard v. Marion Crim. Ct. et al.,* 263 Ind. 236, 329 N.E.2d 573 (1975). The issue there was whether the Indiana statutes governing grand juries authorized subpoenas *duces tecum* or only subpoenas *ad testificandum.* The statutes used the term "subpoena" without qualification, and spoke of requiring witnesses "to appear and testify." The Indiana Supreme Court did not rely on the inherent power of courts to issue subpoenas, but looked at the problem as one of statutory interpretation in which it was required to meet the same kind of *"expressio unius"* argument made here.

In doing so it discussed at length the investigative role of the

grand jury throughout the history of this country, noting that "[i]t has long been recognized that a primary function of the grand jury is to conduct investigations which have been pejoratively called inquisitions." (*Id.* at 245.) The court concluded that the function was still a vital one, and recognized as such by the legislature when it charged the grand jury with its ongoing duty:

"The grand jury as a powerful arm of the court has not been withered by the legislature. In view of its broad purpose in ferreting out criminal conduct, we are reluctant to wither that arm by reading the statute as relators would have us read it. To do so would render the legislative command to the grand jury to inquire into 'wilful and corrupt misconduct in office of public officers of every description' . . . a nearly impossible task. If the personal records of public officials bear the indelible marks of illegal conduct, those records should, with proper safeguards, be made available for the grand jury's inspection. We, therefore, conclude that the grand jury may require witnesses to produce papers and documents relevant to the grand jury investigation." (*Id.* at 247-8.)

The analysis, it will be seen, is the same as ours in this case.

In practice in this state grand jury investigations are relatively rare, while prosecutorial investigations are relatively frequent. We ordinarily commence our prosecutions by complaint and preliminary hearing rather than by indictment. We think it may be fairly said that the inquisition statutes we deal with here have largely replaced the grand jury investigation as a working tool of law enforcement, and that fact was surely known to the legislature when it enacted the 1970 code of criminal procedure. If we are to give a common-sense construction to the statute we must hold that the power to subpoena a witness to testify encompasses the power to compel the production of unprivileged documents in the possession of the witness.

Bell makes some argument that the conclusion we reach would be unconstitutional. *United States v. Miller,* 425 U.S. 435, 48 L.Ed.2d 71, 96 S.Ct. 1619 (1976), cited by Bell, establishes that bank customers have no Fourth Amendment interest in their bank records, so that such records could be lawfully obtained by a grand jury through subpoenas *duces tecum* addressed to a bank. We would suppose this disposes of any claim which might be made by Bell's customers. More recently, in *Zurcher v. Stanford Daily,* 436 U.S. 547, 56 L.Ed.2d 525, 98 S.Ct. 1970 (1978), it was held that documentary information about suspected criminal activity could be obtained from an innocent third party—even a

newspaper—by means of a search warrant. The Court there rejected the argument (accepted by the courts below) that the prosecutor should have first proceeded in a less drastic fashion, by way of a subpoena *duces tecum.* That case would appear to dispose of Bell's interests, which surely do not rise to the level of the First Amendment rights of a newspaper. And *cf. United States v. New York Telephone Co.,* 434 U.S. 159, 54 L.Ed.2d 376, 98 S.Ct. 364 (1977).

Bell also points to the possibility of abuse if the prosecutor's discretion is unfettered. The short answer is that there is no claim of abuse in this case. Beyond that, the courts are always open to prevent abuse in suits such as this one, if the need arises. In the meantime, we indulge in the customary presumption that public officers will act in good faith.

The judgment is reversed and the case is remanded with directions to dissolve the injunction and render a declaratory judgment in favor of the district attorney.