No. 93,383

ALPHA MEDICAL CLINIC AND BETA MEDICAL CLINIC, *Petitioners,* v. HONORABLE RICHARD ANDERSON, JUDGE OF THE THIRD JUDICIAL DISTRICT, SHAWNEE COUNTY, KANSAS, AND PHILL KLINE, ATTORNEY GENERAL FOR THE STATE OF KANSAS, *Respondents.*

(128 P.3d 364)

904

Opinion filed February 3, 2006.

*Lee Thompson,* of Thompson Law Firm, LLC, of Wichita, argued the cause, and *Daniel E. Monnat,* of Monnat & Spurrier, Chartered, of Wichita, *Pedro L. Irigonegaray, Robert V. Eye,* and *Elizabeth R. Herbert,* of Irigonegaray & Associates, of Topeka, *Douglas N. Ghertner* and *Robert A. Stopperan,* of Slagle, Bernard & Gorman, P.C., of Kansas City, Missouri, *Roger Evans,* of New York, New York, and *Helene T. Krasnoff,* of Washington, D.C., were with him on the briefs for petitioners.

*Eric K. Rucker,* chief deputy attorney general, and *Robert T. Stephan,* special assistant attorney general, argued the cause, and *Jared S. Maag,* deputy attorney general, *Stephen D. Maxwell,* senior assistant attorney general, and *Kristafer Ailslieger,* assistant attorney general, were with him on the brief for respondent Phill Kline.

*Thomas J. Drees,* Ellis County Attorney, was on the brief for *amicus curiae* Kansas County and District Attorneys' Association.

The opinion of the court was delivered by

BEIER, J.: This is an original action in mandamus brought by petitioners Alpha Medical Clinic and Beta Medical Clinic arising out of an inquisition in which respondent Attorney General Phill Kline subpoenaed the entire, unredacted patient files of 90 women and girls who obtained abortions at petitioners' clinics in 2003. At the time the petition in this action was filed, respondent Shawnee County District Judge Richard Anderson had ordered the files produced to the court for an initial in camera review by an attorney

appointed by the judge and a physician or physicians appointed by the attorney general. We stayed that order pending our consideration of the matter.

The parties' pleadings and briefs raise several issues: (1) Is mandamus an appropriate avenue for relief? (2) To what degree, if any, must the inquisition subpoenas be limited because of the patients' constitutional right to privacy? (3) To what degree, if any, must the inquisition subpoenas be limited because of the Kansas statutory physician-patient privilege? (4) To what extent, if any, are the petitioners entitled to be further informed regarding the purpose and scope of the inquisition? (5) Should the nondisclosure provisions of the subpoenas be enforced? and (6) Should the attorney general be held in contempt for speaking publicly about matters held under seal in this court?

*Factual and Procedural Background*

The two subject subpoenas were issued September 21, 2004. Each contained a return date of October 5, 2004, and provided that objections, if any, would be due by September 24, 2004. The subpoenas stated the district court had found there was probable cause "to believe that evidence of a crime or crimes may be located" in the patient files, identified by state record number, provider number, and patient identification number. Further, each subpoena provided: "The existence of this subpoena and any records produced pursuant to such are to remain confidential and not to be disclosed to any other person or entity."

Petitioners filed a motion to quash the subpoenas and sought additional information about the violations of the law under investigation so they could analyze and argue whether the subpoenas were reasonable or an abuse of process. On October 5, 2004, Judge Anderson heard the parties' arguments on the motion to quash.

At that hearing, Stephen Maxwell of the attorney general's office characterized the inquisition as "massive in nature." Potential violations of two specific statutes were mentioned: K.S.A. 65-6703, which deals with abortions performed at or after 22 weeks' gestational age, and K.S.A. 2004 Supp. 38-1522, which governs mandatory reporting of suspected child abuse.

Petitioners, for their part, argued that the attorney general is a vocal opponent of abortion rights and interprets the K.S.A. 65-6703 exception to prohibition of abortions at 22 weeks' gestational age or later to be limited to consideration of the physical health of the pregnant woman, rather than including consideration of her mental health. Petitioners asserted that this interpretation conflicts with United States Supreme Court precedent and could not therefore provide a basis for the court's probable cause determination. Petitioners conceded, however, that if the files could contain evidence of violations of Kansas law not premised on a new or unannounced legal interpretation, and the evidence could not otherwise be obtained, the State had demonstrated a compelling interest justifying an order to produce at least parts of the files.

In an apparent response to petitioners' argument regarding the unconstitutionality of the attorney general's interpretation of the statutory exception, Maxwell agreed that no crime had been committed (or, presumably, would need to be prosecuted) if the investigation ultimately turned up no more than a reasonable medical debate over the condition of each of the patients and the threats posed to her by continuing her pregnancy to term.

At the conclusion of the hearing, Judge Anderson orally denied the motion to quash and ordered production of the subpoenaed files by October 15, 2004.

Petitioners filed a motion for reconsideration on October 8, 2004, and informed Judge Anderson of their intent to file a petition for writ of mandamus in the event their motion for reconsideration was denied. Five days later, Judge Anderson ordered a stay of the production of the files until his further order.

On October 21, 2004, the judge issued a written Memorandum and Order, requiring petitioners to produce the 90 unredacted patient files by October 28, 2004. The order stated that K.S.A. 65-6703 prohibited an abortion when the fetus is viable unless the referring physician and performing physician "determine that the abortion is necessary to preserve the life of the pregnant woman *and* that a continuation of the pregnancy would cause a substantial and irreversible impairment of a major bodily function of the pregnant woman." (Emphasis added.) Judge Anderson also noted that

the statute required the gestational age of the fetus to be determined, the basis for that determination to be documented, and both ultimately to be reported to the Kansas Department of Health and Environment. He continued:

"The Court has considered the medical facilities' assertions of constitutional flaws in the application of K.S.A. 65-6703. The Court does not find the presumed flaws preclude production of the records. The Attorney General has described sufficient basis for conducting the inquisition. Even assuming the constitutional flaws in the presumed application of K.S.A. 65-6703 as suggested by the medical facilities, the Court finds the Attorney General is authorized to conduct the inquisition."

Judge Anderson's order also discussed K.S.A. 2004 Supp. 38-1522, the statute governing mandatory reporting of suspected child abuse, specifically distinguishing the case before him from an ongoing federal court action. See *Aid for Women v. Foulston*, 441 F.3d 1101 (10th Cir. 2006). Judge Anderson noted that the federal case involved investigations of "mandatory reporting of sexual activity between similar age minors when injury is not reasonably suspected," which this case does not. Kline has issued a formal written opinion stating that all sexual intercourse engaged in by anyone younger than 16 is, by definition, rape and inherently injurious. Att'y Gen. Op. No. 2003-17. Kline's opinion deviates from the position of his predecessor once removed, now his lawyer in the contempt proceeding, Robert T. Stephan. See Att'y Gen. Op. No. 1992-48.

Judge Anderson's order also provided for certain precautions to guard against unnecessary disclosure of sensitive, confidential, or irrelevant information in the patient files: (1) The files were to be deposited in the district court and would not be disclosed to anyone, including the attorney general or his agents, until further court order; (2) the court would select special counsel to conduct an initial in camera review of the files and to assist in identifying sensitive, confidential, or irrelevant information; and (3) the court would require the attorney general to "nominate one or more licensed physicians to examine medical records" and to explain to the court the relevance of any document designated for photocopying. Judge Anderson also stated that the redaction of patient-identifying information would be considered before any copies of the

files would be released. Finally, petitioners were to be given an opportunity to make suggestions regarding the management of the records to cause no broader intrusion into the patients' privacy than necessary.

In response, petitioners filed a motion for a protective order, asking Judge Anderson to permit them to redact identifying information from the files before production. Judge Anderson had not ruled on this motion when the petition for mandamus was filed with this court on October 26, 2004, 2 days before production was required under the district court order.

Certain additional facts concerning the inquisition have been revealed in the course of the proceedings in the district court and before us. An affidavit generated by a lawyer in the attorney general's office confirms that the inquisition had been ongoing for approximately 2 years as of May 2005, and focuses on at least allegedly unjustified "late-term" abortions and possible unreported child sexual abuse. Maxwell also asserted before Judge Anderson that crimes other than violations of the criminal abortion and mandatory child abuse reporting statutes might be uncovered. Moreover, Deputy Attorney General Eric Rucker stated at oral argument before this court that the inquisition concerned emotional abuse, as well as sexual abuse, of minors.

Approximately three-fourths of the files sought deal with adult patients; the remainder detail services provided to minors. Approximately two-thirds of the files are sought from Alpha Medical Clinic, the remaining one-third from Beta Medical Clinic, which does not perform "late-term" abortions.

Rucker also stated before this court that petitioners and child molesters are the targets of this criminal inquisition and that there is probable cause to believe that each of the 90 files would provide evidence of at least one felony and one misdemeanor. Indeed, he said that each of the adult patients' files was expected to contain evidence of more than one felony. Rucker also informed this court that none of the patients whose files are sought is a target of the inquisition. See K.S.A. 65-6703(c) (patient cannot be prosecuted under criminal abortion statute). Rucker was — and the record is

— silent on whether individual physicians also are targets of the inquisition.

## The Parties' Positions

In their brief, petitioners assert that we must compel Judge Anderson and Kline to cease further enforcement of the subpoenas. Should we regard this outcome as too extreme, they propose several alternatives: (1) An order that respondents desist from seeking further enforcement of the subpoenas without first demonstrating in a hearing that a compelling need for the patient files exists and that the State seeks no more protected information than that amount absolutely necessary to meet the compelling need; (2) an order permitting petitioners to redact all patient-identifying and irrelevant information from the files before production; and (3) an order requiring Judge Anderson to enter a protective order to protect the patients' rights before the files are produced.

The attorney general argues: (1) Mandamus is not an appropriate remedy because respondents have not failed to perform a clear legal duty owed to petitioners, because mandamus cannot be used to thwart a criminal investigation, and because the petition improperly seeks injunctive relief based on issues not ripe for review; (2) even if mandamus is hypothetically appropriate, there is no constitutional or statutory basis for the extraordinary judicial intervention urged by the petitioners, and such intervention would do violence to the prosecutorial function and the separation of powers; (3) the enforcement of the subpoenas will not violate any patient's constitutional right to privacy, because investigation and prosecution of crimes are compelling state interests and the district court's order is narrowly tailored to protect the rights of the patients while meeting the needs of the inquisition; and (4) the physician-patient privilege is not applicable in this matter.

Petitioners' and the attorney general's positions on one other aspect of the case also are worth noting at this point. Since the beginning of this mandamus proceeding, petitioners also sought to stay the subpoenas' nondisclosure provision. Petitioners' supplemental motion on this subject was granted by this court on March 9, 2005. Earlier — on October 28, 2004 — we had entered an

order requiring all filings in the mandamus action to be kept under seal.[1] We eventually made an exception for the formal briefs to be filed by the parties. Ultimately, these orders and their potential intersection gave rise to petitioners' allegation that the attorney general is in contempt of this court because of certain attachments to his brief and his public comments thereon.

In this mandamus action, Judge Anderson does not argue the points raised by the other parties. Rather, in his Answer and Statement Regarding Joint Petition for Writ of Mandamus and Order Staying Production of Medical Records, he seeks guidance from this court on the following four questions:

"1.   After a motion to quash an inquisition subpoena has been filed or otherwise, does a district court have the authority or any obligation under the inquisition statute or other applicable law to grant a person or entity challenging the subpoena any other procedural rights, such as a hearing, in addition to filing a motion to quash and, if so, what are these rights?   .

"2.   After a motion to quash an inquisition subpoena has been filed or otherwise, does a district court have the authority or any obligation under the inquisition statute or other applicable law to disclose to the subpoena recipient all or any portion of the information constituting the factual basis for the reasonable suspicion upon which the subpoena was issued, and, if so, under what circumstances and to what extent?

"3.   To what extent, if any, does the recipient of an inquisition subpoena have a right to confront or challenge the evidence of reasonable suspicion upon which the subpoena was issued and, if so, at what stage of the inquisition?

"4.   Upon motion to quash an inquisition subpoena or otherwise, is a district court authorized to conduct or supervise an in camera review of subpoenaed materials or utilize other measures it deems appropriate to protect the competing interests of the Attorney General under the inquisition statute and those of a subpoena recipient or others?"

Finally, this court also received an *amicus curiae* brief from the Kansas County and District Attorneys' Association. The Association argues that the judicial branch has only a limited role in the pre-charge phase of criminal investigations and should involve itself in

---

[1] Certain matters that have been contained only in pleadings filed under seal require discussion in order to decide the merits of this mandamus action. This court lifts the seal only to the extent such matters are mentioned of necessity in this opinion.

review of the prosecutor's actions only "if extraordinary circumstances warrant it and no other relief would satisfy the cause of justice."

*Filings Since Oral Argument*

After oral argument on September 8, 2005, the attorney general's office filed two Motions to Clarify statements made by Rucker earlier that day.

One of the motions states that the attorney general "has no qualms with" the district court, rather than the attorney general, selecting the physician who would do the initial in camera review of the patient files. The attorney general "simply opposes said physician(s) being appointed by petitioners who are the targets of the criminal investigation." This motion also states that the attorney general does not oppose redaction of all patient-identifying information before the district court's special counsel and physician perform the in camera review, although it asserts that Judge Anderson will need to be provided with the redacted information "in order to cross-reference the files with records and evidence from other sources."

The other motion, despite its caption, changes rather than clarifies certain statements made by Rucker in response to questions from members of this court during oral argument. It states in pertinent part:

"1. As part of this criminal investigation and/or inquisition, respondent has sought records and information from other mandatory reporters besides the petitioners in the present mandamus action. This effort has included subpoenas for records relating to live births involving mothers under the legal age of sexual consent.

"2. At oral argument, counsel was unable to directly and adequately respond to the questions from the bench specifically relating to this topic because of the secret nature of the criminal investigation and inquisition and the existence of a do not disclose order relating to the subpoenas of live birth records."

It is evident that, at least in the attorney general's judgment, whatever order allegedly compelled Rucker to be less than forthright in his answers to this court's questions on September 8, 2005, had either been lifted or dissipated or overcome by a competing priority by mid-October 2005, when Kline called a press confer-

ence and announced that he had obtained the birth records of 62 babies born to girls younger than 16. The mechanism by which Kline obtained these records remains somewhat unclear, as does the reason for and timing of the press conference.

We also note that petitioners, since oral argument, filed a Motion for Order Directing the District Court to Forward the Entire Inquisition Record to This Court, and that the attorney general filed a response to this motion. We deny this motion at this time, because we are able to address the issues raised in this mandamus proceeding on the record before us.

*The Criminal Inquisition Statutory Scheme*

K.S.A. 2004 Supp. 22-3101 *et seq.* governs the conduct of inquisitions in criminal cases in Kansas.

K.S.A. 2004 Supp. 22-3101(1) authorizes the attorney general, if he or she has knowledge of any alleged violation of Kansas law, to apply to a district judge to conduct an inquisition. Once the attorney general's verified application setting forth the alleged violation of the law is filed, the judge "shall issue a subpoena for the witnesses named in such praecipe commanding them to appear and testify concerning the matters under investigation." K.S.A. 2004 Supp. 22-3101(1).

K.S.A. 2004 Supp. 22-3101 does not mention subpoenas duces tecum such as those at issue here, but they are used regularly in criminal cases across the state. Our Court of Appeals has previously held that such subpoenas may issue in a prosecutor's inquisition focused on violations of narcotics laws under K.S.A. 2004 Supp. 22-3101(2). *Southwestern Bell Tel. Co. v. Miller*, 2 Kan. App. 2d 558, 583 P.2d 1042, *rev. denied* 225 Kan. 845 (1978). In addition, this court has implicitly upheld the *Southwestern Bell* decision on at least three separate occasions. See *State ex rel. Brant v. Bank of America*, 272 Kan. 182, 188, 31 P.3d 952 (2001) (State Securities Commissioner subpoenas of bank documents in connection with administrative investigation); *State v. Schultz*, 252 Kan. 819, 822-23, 850 P.2d 818 (1993) (inquisition subpoenas of bank, phone records); *State ex rel. Cranford v. Bishop*, 230 Kan. 799, 800-01, 640 P.2d 1271 (1982) (district court has the inherent power to

refuse to issue subpoenas to avoid abuse of judicial process); see also *State, ex rel. v. Rohleder*, 208 Kan. 193, 490 P.2d 374 (1971) (pre-*Southwestern Bell* decision; inquisition subpoena sought testimony and production of books, records, and invoices). We agree that both the K.S.A. 2004 Supp. 22-3101(1) *judicial* inquisition of this case and the K.S.A. 2004 Supp. 22-3101(2) *prosecutorial* inquisition at issue in the Court of Appeals' *Southwestern Bell* case permit subpoenas calling for the production of documents as well as subpoenas calling for witness testimony.

The statute also provides that "[a]ny person who disobeys a subpoena issued for such appearance or refuses to be sworn as a witness or answer any proper question propounded during the inquisition, may be adjudged in contempt of court." K.S.A. 2004 Supp. 22-3101(3). Similarly, this provision would apply if a person or entity refuses without justification to respond to an inquisition subpoena duces tecum.

The statute is silent on the standard that governs a district court's pre-subpoena review of the attorney general's allegations, and there appears to be some confusion on this point in the record before us: The two subpoenas at issue recite that Judge Anderson has found *"probable cause* exists to believe that evidence of a crime or crimes may be located in the medical records identified." (Emphasis added.) However, two of the questions Judge Anderson directed to our attention in this proceeding specifically assume that a district judge's only duty before issuing inquisition subpoenas duces tecum is to find *reasonable suspicion* that evidence of the alleged violations will be found in the documents sought. Although the parties have not focused on this question, we believe it necessary to address it so that we are responsive to Judge Anderson's questions.

The purpose of an inquisition is to gather information to determine whether probable cause exists to support a criminal prosecution. *State v. Cathey*, 241 Kan. 715, 720, 741 P.2d 738 (1987); *In re Investigation into Homicide of T.H.*, 23 Kan. App. 2d 471, 473, 932 P.2d 1023 (1997). It does not make sense to require a prosecutor seeking an inquisition subpoena to meet a probable cause standard in order to gather information he or she needs to

determine whether probable cause for prosecution exists. We therefore hold that the standard to be employed by a district judge evaluating whether to issue subpoenas for witness testimony or documents under K.S.A. 2004 Supp. 22-3101(1) is reasonable suspicion rather than probable cause.

### The Known Criminal Statutes at Issue

As previously mentioned, the attorney general has expressly alleged that petitioners violated two statutes: K.S.A. 65-6703, the criminal abortion statute, and K.S.A. 2004 Supp. 38-1522, which requires reporting of sexual abuse of children.

The structure of K.S.A. 65-6703 is as follows:

A pregnant woman who desires an abortion must have her treating physician determine the gestational age of the fetus. If that age is less than 22 weeks, then the woman may obtain an abortion as long as appropriate documentation requirements are met. K.S.A. 65-6703(b)(1).

If the gestational age is 22 weeks or more, the treating physician must then make a determination of fetus viability, *i.e.*, the ability of the fetus to survive outside the womb. K.S.A. 65-6703(b)(2). If the fetus is not viable, the woman may obtain an abortion as long as appropriate documentation and reporting requirements are met. K.S.A. 65-6703(b)(3).

If the fetus is viable, then the treating physician and the physician who will perform the abortion must agree that the abortion is necessary to preserve the life of the pregnant woman or because "continuation of the pregnancy will cause a substantial and irreversible impairment of a major bodily function of the pregnant woman," before an abortion can be performed and documented. K.S.A. 65-6703(a); (b)(4).

Violation of this statute is a Class A nonperson misdemeanor for the first violation and a severity level 10 nonperson felony for any subsequent violation. K.S.A. 65-6703(g).

The second statute known to be at issue, K.S.A. 2004 Supp. 38-1522, requires health care providers, *inter alia*, to file a report with the Kansas Department of Social and Rehabilitation Services when they have "reason to suspect that a child has been injured as a

result of physical, mental or emotional abuse or neglect or sexual abuse." K.S.A. 2004 Supp. 38-1522(a). Sexual abuse, as defined under K.S.A. 2004 Supp. 38-1502(c), includes sexual intercourse with a child under 16 years of age. See K.S.A. 2004 Supp. 21-3502(a)(2); K.S.A. 21-3504(1). K.S.A. 2004 Supp. 38-1522(f) provides that willful and knowing failure to report injury to a child arising from abuse is a class B misdemeanor.

There is no dispute between the parties that petitioners have a legal duty to report suspected child sexual or other abuse, including sexual intercourse with a child under 16, under these provisions.

### Propriety of Mandamus

The Kansas Constitution provides this court with original jurisdiction for proceedings in mandamus. Kan. Const. Art. 3, § 3. In addition, K.S.A. 60-801 provides:

"Mandamus is a proceeding to compel some inferior court, tribunal, board, or some corporation or person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law."

This court also has recognized mandamus as an appropriate avenue to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of public business. *Wilson v. Sebelius*, 276 Kan. 87, 90, 72 P.2d 553 (2003). Also, although a district judge's discretion cannot be controlled by mandamus, if the judge's order threatens to deny a litigant a right or privilege that exists as a matter of law and there would be no remedy by appeal, mandamus may be invoked. *Hulme v. Woleslagel*, 208 Kan. 385, 388, 493 P.2d 541 (1972). This court may also exercise its original jurisdiction and settle a question through mandamus if the petition presents an issue of great public importance and concern. *Wesley Medical Center v. Clark*, 234 Kan. 13, 16, 669 P.2d 209 (1983).

Respondent Kline does not deal directly with these authorities, instead continuing to assert that mandamus must be limited to situations in which a public official has failed to perform a clear legal duty. We agree that such a situation is appropriate for our intervention via mandamus, but mandamus also can be pursued in

the situations described by the *Wilson, Hulme,* and *Wesley Medical Center* cases cited above. In our view, the situation before us here fits each of those precedents.

It is evident from the questions Judge Anderson submitted to this court that he seeks an authoritative interpretation of the law to guide him in his performance of his judicial responsibilities. In addition, petitioners are correct in their contention that, if Judge Anderson's order is allowed to stand as is, and it is later determined that it relied upon an erroneous interpretation of the law, there will be no sufficient remedy on appeal for patients whose rights to privacy have already been violated. And, finally, no one can argue convincingly that the questions of whether and when a pregnant woman's constitutional right to privacy in her reproductive choices must give way to public regulation of abortion is not an issue of great public concern. The issue of abortion has long had a polarizing effect on national and state politics and policies. Although some may lament this fact, they cannot deny it.

Kline also argues that allowing petitioners to obtain relief through mandamus will thwart his investigation. We disagree. Petitioners do not seek to stop the entire investigation. Rather, at this stage of the proceeding, they appear to insist only that their patients' privacy rights must be balanced with the State's compelling need for information relevant to the criminal investigation. See *King v. State,* 272 Ga. 788, 791-92, 535 S.E.2d 492 (2000) (State's use of subpoena for compelling interest of enforcing criminal laws must be narrowly tailored to make certain "equally compelling constitutional right of privacy is not unreasonably impacted").

Kline next argues that this action should be dismissed because petitioners seek injunctive relief and because the issues raised are not ripe for review. He is correct that this court does not have original jurisdiction to issue injunctive relief, see *Dean v. State,* 250 Kan. 417, 427, 826 P.2d 1372, *cert. denied* 504 U.S. 973 (1992); *Collins v. York,* 175 Kan. 511, Syl. ¶ 2, 265 P.2d 313 (1954), but this is not the remedy petitioners seek. They do not assert that the inquisition should be enjoined. At least by the time of oral argument before this court, they acknowledged the State's legitimate

law enforcement interest and sought only to have their patients' rights weighed appropriately against it.

· As for ripeness, Kline emphasizes that the district court has not yet had an opportunity to review the medical records in camera. This is unpersuasive, because, as Judge Anderson's order now stands, a physician or physicians selected solely by the attorney general would be permitted to participate in that review. The attorney general's post-oral argument position recognizes the competing interests at stake, acknowledging the district judge should select the reviewing physician or physicians. It also demonstrates that the ripeness argument is without merit.

Finally, even if mandamus is hypothetically appropriate, Kline argues that there is no constitutional or statutory basis for this extraordinary judicial intervention and that such intervention would do violence to the prosecutorial function and the separation of powers.

The attorney general is correct that prosecution of crime is an executive function. See *State v. Compton*, 233 Kan. 690, 698, 664 P.2d 1370 (1983); *State, ex rel., v. Rohleder*, 208 Kan. 193, 194-95, 490 P.2d 374 (1971). And this court is mindful of its obligation to respect our state constitution's separation of powers among the three branches of government. See *State v. Beard*, 274 Kan. 181, 185, 49 P.3d 492 (2002). However, Kline's separation of powers argument is otherwise unpersuasive. He fails to cite any authority supporting the idea that courts cannot review requests for subpoenas in inquisitions. The statutory language, *i.e.*, K.S.A. 2004 Supp. 22-3101, clearly supports that power in the courts. Moreover, Kline admits that courts are required to prevent abuse of the judicial process by prosecutors. See *State ex rel. Cranford*, 230 Kan. at 800-01.

In view of the foregoing, we hold that mandamus is the appropriate avenue for relief, if petitioners are able to demonstrate that relief is merited. See *State, ex rel., v. Salome*, 169 Kan. 585, 595, 220 P.2d 192 (1950) (burden on mandamus petitioner).

### Constitutional Right to Privacy

Petitioners argue that mandamus is warranted because Judge Anderson's order fails to protect the subject patients' constitutional rights to privacy. The attorney general asserts that the patients' rights are adequately protected by Judge Anderson's order.

We discern the possibility for infringement of three federal constitutional privacy interests.

The first is the right to maintain the privacy of certain information. See *Whalen v. Roe*, 429 U.S. 589, 599 n.25, 51 L. Ed. 2d 64, 97 S. Ct. 869 (1977) ("right to be let alone" is most valued); *Eastwood v. Dept. of Corrections of State of Okl.*, 846 F.2d 627, 631 (10th Cir. 1988) (information regarding "personal sexual matters"); see also *A.L.A. v. West Valley City*, 26 F.3d 989, 990 (10th Cir. 1994) ("confidential medical information is entitled to constitutional privacy protection"); *Aid for Women v. Foulston*, 441 F.3d 1101 (minors' right to informational privacy).

A second, perhaps related, federal constitutional right to obtain confidential health care has been recognized explicitly by at least the Sixth Circuit. See *Gutierrez v. Lynch*, 826 F.2d 1534, 1539 (6th Cir. 1987); *In re Zuniga*, 714 F.2d 632, 642 (6th Cir.), *cert. denied Zuniga v. United States*, 464 U.S. 983 (1983); see also *Mann v. University of Cincinnati*, 824 F. Supp. 1190, 1199 (S.D. Ohio 1993) ("patients' interest in making decisions vital to their health care may be impaired by unwarranted disclosures"). And, as noted in the *Mann* case out of the Southern District of Ohio, other federal district courts have echoed the Sixth Circuit position. *Mann*, 824 F. Supp. at 1196 n.2, citing *Inmates of New York State with Human Immune Deficiency Virus v. Cuomo*, No. 90-CV-252, 1991 WL 16032 (N.D.N.Y. Feb. 7, 1991); *Rodriguez v. Coughlin*, No. CIV-87-1577E, 1989 WL 59607 (W.D.N.Y. June 5, 1989); *Doe v. Meachum*, 126 F.R.D. 452 (D. Conn. 1989); *Plowman v. United States Dep't of Army*, 698 F. Supp. 627, 633 and n.22 (E.D. Va. 1988); *Doe v. Coughlin*, 697 F. Supp. 1234, 1237 (N.D.N.Y. 1988); *Woods v. White*, 689 F. Supp. 874, 876 (W.D. Wis. 1988), *aff'd* 899 F.2d 17 (7th Cir. 1990). See *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994). Compare *Borucki v. Ryan*, 827 F.2d 836, 840 (1st

Cir. 1987) (discussing "confidentiality" and "autonomy" aspects of federal constitutional right to privacy: "the individual interest in avoiding disclosure of personal matters" and "the interest in independence in making certain kinds of important decisions"); *Pesce v. J. Sterling Morton High Sch. Dist.*, 830 F.2d 789, 796 (7th Cir. 1987) (same); *In re Search Warrant*, 810 F.2d 67, 71-72 (3d Cir. 1987) (balancing patients' rights to privacy in medical records against government intrusion through warrant directed to physician under investigation for insurance fraud). But see *Sherman v. Jones*, 258 F. Supp. 2d 440, 442-43 (E.D. Va. 2003) (citing *Whalen v. Roe* and Fourth Circuit precedent to conclude individual's confidential medical information outside constitutionally protected "zone of privacy").

The third federal constitutional right at stake, long recognized and protected by the United States Supreme Court, is the fundamental right of a pregnant woman to obtain a lawful abortion without government imposition of an undue burden on that right. See, *e.g.*, *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 874-78, 120 L. Ed. 2d 674, 112 S. Ct. 2791 (1992). If inquisition subpoenas for documents related to abortions are not handled sensitively, the fundamental rights of women who may seek abortions in the future could be substantially impaired or the assertion of those rights prevented.

We have not previously recognized — and need not recognize in this case despite petitioners' invitation to do so — that such rights also exist under the Kansas Constitution. But we customarily interpret its provisions to echo federal standards. See, *e.g.*, *State v. Morris*, 255 Kan. 964, 979-81, 880 P.2d 1244 (1994) (double jeopardy provisions of federal, Kansas constitutions "co-equal"); *State v. Schultz*, 252 Kan. 819, 824, 850 P.2d 818 (1993) (Section 15 of Kansas Constitution's Bill of Rights identical in scope to Fourth Amendment of federal Constitution); *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, 426, 636 P.2d 760 (1981) (Section 1 of Kansas Constitution's Bill of Rights given same effect as Equal Protection Clause of Fourteenth Amendment of federal Constitution).

Regarding petitioners' standing to assert their patients' rights, the United States Supreme Court has held that abortion providers can take such action. *Singleton v. Wulff*, 428 U.S. 106, 117, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976) (physician had standing to assert rights of patients seeking abortions; patient "may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity of a court suit"). The Seventh Circuit has followed suit. See *Northwest Memorial Hosp. v. Ashcroft*, 362 F.3d 923, 928 (7th Cir. 2004) (Department of Justice acknowledgment that hospital-custodian of medical records of women's abortions is appropriate representative of patient's privacy interests). And a panel of the Tenth Circuit has concluded that providers of family planning services have third-party standing to assert their patients' informational privacy rights. *Aid for Women v. Foulston*, 441 F.3d 1101.

Having identified specific constitutional privacy interests and confirmed petitioners' standing to champion them, we next examine the extent of the State's interest in invading patient privacy. It is beyond dispute that the State has a compelling interest in pursuing criminal investigations. See *Branzburg v. Hayes*, 408 U.S. 665, 699-701, 33 L. Ed. 2d 626, 92 S. Ct. 2646 (1972). And an individual's right to informational privacy is not necessarily "absolute; rather, it is a conditional right which may be infringed upon a showing of proper governmental interest." *Planned Parenthood of Southern Arizona v. Lawall*, 307 F.3d 783, 790 (9th Cir. 2002) (citing *In re Crawford*, 194 F.3d 954, 959 [9th Cir. 1999]). Also, the fundamental right to obtain a lawful abortion may be regulated as long as the regulation does not constitute an undue burden. See *Casey*, 505 U.S. 874-78.

Our evaluation necessarily involves weighing of these competing interests, including the type of information requested, the potential harm in disclosure, the adequacy of safeguards to prevent unauthorized disclosure, the need for access, and statutory mandates or public policy considerations. See *Lawall*, 307 F.3d at 790 (citing *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 578 [3rd Cir. 1980]); see also *Sheets v. Salt Lake County*, 45 F.3d 1383,

1387 (10th Cir. 1995) (disclosure of diary must advance compelling state interest in least intrusive manner).

Petitioners contend the attorney general has not shown a compelling need for *unredacted* patient files. Kline now takes the position that the patients' identifying information may be redacted. Petitioners further assert that it is "inconceivable" the disclosure of *entire* patient files would be the least intrusive way to meet a compelling state interest in uncovering noncompliance with the criminal abortion and mandatory child abuse reporting statutes. Petitioners have pointed to the example of the many details of each patient's sexual and contraceptive history that the files are likely to contain but that are equally likely to be irrelevant to the factors required to be considered and documented under the criminal abortion statute. With regard to the child abuse reporting statute, we expect that nearly all information except the identity and age of the male who impregnated the minor patient, his relationship to the minor patient, the circumstances surrounding the sexual intercourse that produced the pregnancy, and compliance or noncompliance with reporting requirements is likely to be irrelevant to Kline's inquiry.

The type of information sought by the State here could hardly be more sensitive, or the potential harm to patient privacy posed by disclosure more substantial. Judge Anderson's order does not do all it can to narrow the information gathered or to safeguard that information from unauthorized disclosure once it is in the district court's hands. Although the criminal inquisition statutes do not speak to the need for such narrowing and safeguards, the constitutional dimensions of this case compel them.

Under the circumstances of this case, Judge Anderson was correct to hold a closed hearing to allow the parties to address appropriate limitations on disclosure — limitations that strike the necessary balance between patient privacy and government investigation. His order simply failed to incorporate all that the hearing had revealed. We discern three specific errors:

First, the judge misstated a critical provision of the criminal abortion statute. The two physicians who must agree that an abortion at 22 weeks' gestational age or later is necessary must do so

on the basis that the life of the pregnant woman is endangered *or* on the basis that "continuation of the pregnancy would cause a substantial and irreversible impairment of a major bodily function of the pregnant woman." K.S.A. 65-6703(a). Judge Anderson joined these two bases by the conjunction "and" rather than the disjunctive "or." This misstatement of the law must be corrected lest the attorney general be misled as to the limits of his authority to prosecute.

Second, Judge Anderson also stated that "presumed flaws" in the attorney general's interpretation of the criminal abortion or mandatory child abuse reporting statutes would not prevent production of the files called for in the subpoenas. In essence, this statement adopted senior assistant attorney general Maxwell's position that any error in the attorney general's interpretation was irrelevant. We disagree. To hold otherwise could permit exactly the abuse of prosecutorial power the courts must be vigilant to prevent. To the extent the inquisition rests on the attorney general's ignorance, disregard, or misinterpretation of precedent from the United States Supreme Court, subpoenas pursuant to the inquisition cannot be allowed.

For example, the United States Supreme Court has long held, and continues to hold that, in order to be constitutional, *state restrictions on abortions must include exceptions to preserve both the life and health of the pregnant woman.* See *Casey,* 505 U.S. at 846 (emphasizing this rule as part of the "essential holding" of *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705, *reh. denied* 410 U.S. 959 [1973]); see also *Ayotte v. Planned Parenthood of Northern New England,* 546 U.S. 320, 163 L. Ed. 2d 812, 126 S. Ct. 961 (2006). Moreover, "health" has been interpreted by the United States Supreme Court to include the mental or psychological health of the pregnant woman. See *Doe v. Bolton,* 410 U.S. 179, 191-92, 35 L. Ed. 2d 201, 93 S. Ct. 739 (1973); *United States v. Vuitch,* 402 U.S. 62, 71-72, 28 L. Ed. 2d 601, 91 S. Ct. 1294 (1971). The attorney general has said he disagrees with requiring an exception to preserve the pregnant woman's mental health. Until the *United States Supreme Court or the federal Constitution says otherwise,* however, the mental health of the pregnant woman remains

a consideration necessary to assure the constitutionality of the Kansas criminal abortion statute. Judge Anderson was not free to decide the subpoenas should issue in the first place or whether the petitioners' motion to quash should be denied without considering the soundness of any legal interpretations on which the attorney general depends. This is true of any district judge who passes on an inquisition application or associated subpoenas.

Third, Judge Anderson erred in refusing to allow redaction of patient-identifying information from the files. This information must be redacted by petitioners before the files are turned over to the court. Should patient-identifying information later be required, the district judge may approve appropriate subpoenas for that information at that time.

As noted above, Judge Anderson's order also permitted the attorney general to select the physician or physicians who would participate in the initial in camera review of the records. At oral argument, Rucker stated that the attorney general was unwilling to trust doctors employed by or associated with petitioners to participate in this segment of the process. Understandably, petitioners are equally reluctant to have a physician or physicians selected by the attorney general do so. Kline's Motion to Clarify eliminates this issue, however. The attorney general has now explicitly stated that he does not oppose Judge Anderson's appointment of the physician or physicians to be trusted with this task.

In sum, Judge Anderson must withdraw his order and first evaluate the inquisition and subpoenas in light of what the attorney general has told him regarding his interpretation of the criminal statutes at issue. If the judge requires additional information in order to perform this evaluation, he should seek it from the attorney general in the inquisition proceeding. As targets of the investigation, petitioners need not be included in any hearing or other communication to enable this evaluation.

Only if Judge Anderson is satisfied that the attorney general is on firm legal ground should he permit the inquisition to continue and some version of the subpoenas to remain in effect. Then he also must enter a protective order that sets forth at least the following safeguards: (1) Petitioners' counsel must redact patient-

identifying information from the files before they are delivered to the judge under seal; (2) the documents should be reviewed initially in camera by a lawyer and a physician or physicians appointed by the court, who can then advise the court if further redactions should be made to eliminate information unrelated to the legitimate purposes of the inquisition. This review should also determine whether any of the files demonstrate nothing more than the existence of a reasonable medical debate about some aspect of the application of the criminal abortion and/or mandatory child abuse reporting statutes, which the attorney general's office has already acknowledged would not constitute a crime. If so, those files should be returned to petitioners; and (3) any remaining redacted files should be turned over to the attorney general.

### Statutory Physician-Patient Privilege

Petitioners also contend that the subpoenas violate the physician-patient privilege outlined in K.S.A. 60-427. The attorney general counters that public policy demands the physician-patient privilege not be used to shield criminal conduct.

Because we have ruled that all patient-identifying information must be redacted from the files before they are produced to the attorney general, we need not further discuss the statutory physician-patient privilege at this time. We also do not address — because we have not been asked to do so — whether federal provisions such as the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d *et seq.*, may have application or effect.

### Further Disclosures to Petitioners

Petitioners also contend they should be provided with additional information about the basis for the inquisition. We disagree on current showing. Kansas law clearly establishes that courts should not permit unreasonable subpoenas (see *In re Tax Appeal of Collingwood Grain, Inc.*, 257 Kan. 237, 256-57, 891 P.2d 422 [1995] [subpoenas not unreasonable or oppressive]; *State ex rel. Cranford*, 230 Kan. at 801 [district court has inherent power to refuse issuance of subpoenas]), and we believe the procedure we have re-

quired Judge Anderson to follow adequately addresses the concerns raised at this point by the petitioners.

## Contempt Proceedings

On April 11, 2005, petitioners filed a Joint Motion for Order Directing Attorney General Kline To Show Cause Why He Should Not Be Held In Contempt Of Court For Violating Court Orders Sealing The Record In This Case. Specifically, petitioners took issue with the attorney general's attachment to his brief of redacted portions of the October 5, 2004, district court hearing transcript and the resulting October 21, 2004, Memorandum and Order and with his later press conference at which the brief and its attachments were openly discussed. We issued an Order to Show Cause to the attorney general, who responded in writing and at oral argument before this court.

It is well established that this court "is a constitutional tribunal and has inherent power to punish for contempt and to determine whether a contempt has been committed." *State v. Rose*, 74 Kan. 260, 261, 85 Pac. 803 (1906); see also *In re Root*, 173 Kan. 512, 515, 249 P.2d 628 (1952) ("Of the right of this court to punish for contempt there can be no doubt."). In addition to contempt authority, Kansas courts have the inherent power to impose sanctions for bad faith conduct, irrespective of any statutory provision for sanctions. See *Wilson v. American Fidelity Ins. Co.*, 229 Kan. 416, 421, 625 P.2d 1117 (1981); *Knutson Mortgage Corp. v. Coleman*, 24 Kan. App. 2d 650, 652, 951 P.2d 548 (1997).

Petitioners contend that the attorney general's actions violated three court orders: (1) Judge Anderson's October 4, 2004, order, requested by the attorney general, that directed the parties not to disclose the transcript of the hearing; (2) this court's October 28, 2004, order directing all filings in this action to be made under seal; and (3) the February 14, 2005, written notice sent by the Clerk of the Appellate Courts advising all counsel of record that briefs would be "open records" but that the record itself would remain sealed.

The allegations here relate to what is known as indirect contempt, *i.e.*, conduct outside the presence of a judge. The procedure

governing indirect contempt is found in K.S.A. 2004 Supp. 20-1204a, which is strictly construed against the moving party. *Cyr v. Cyr*, 249 Kan. 94, Syl. ¶ 5, 815 P.2d 97 (1991).

Under this statute, this court lacks jurisdiction to address the first of petitioners' contentions, that Kline violated Judge Anderson's October 5, 2004, order. K.S.A. 2004 Supp. 20-1204a(a) provides that "the court that rendered" an underlying order may address contempt allegations regarding that order. The statute's requirements are jurisdictional. See *Bond v. Albin*, 29 Kan. App. 2d 262, 263, 28 P.3d 394 (2000), *rev. denied* 271 Kan. 1035 (2001). Judge Anderson, rather than this court, must first address petitioners' contempt allegations regarding the October 5, 2004, order.

Petitioners' remaining allegations are correctly addressed to this court, which issued the subject orders.

Indirect contempt may be either criminal or civil. Criminal contempt proceedings attempt " ' "to preserve the power and vindicate the dignity of the courts and to punish for disobedience" ' " of court orders; criminal contempt tends to obstruct the administration of justice. *State v. Davis*, 266 Kan. 638, 645, 972 P.2d 1099 (1999). Civil contempt is failing to do something that the court has ordered for the benefit of another party to the proceeding, and civil contempt proceedings are remedial in nature. *Davis*, 266 Kan. 638, Syl. ¶ 2; *State v. Jenkins*, 263 Kan. 351, 358, 950 P.2d 1338 (1997) (citing *Krogen v. Collins*, 21 Kan. App. 2d 723, 726, 907 P.2d 909 [1995]).

Petitioners do not specifically characterize their allegations as either criminal or civil; rather, they say only that Kline committed "contemptuous conduct" through "intentional disclosure of sealed records." Because this complaint centers on an alleged violation of court orders, this qualifies as an allegation of criminal contempt.

"Before one can be punished for contempt in not complying with the decree of a court, a particular or precise thing to be done by the party proceeded against must be clearly and definitely stated." *Ensch v. Ensch*, 157 Kan. 107, Syl. ¶ 2, 138 P.2d 491 (1943). Further, a party "should not be punished for contempt for disobeying a decree, if the decree is capable of construction consistent with innocence." *Ensch*, 157 Kan. 107, Syl. ¶ 3; compare *Jenkins*, 263

Kan. at 358 (criminal contempt directed against dignity and authority of court, obstructing administration of justice). Moreover, intent is sometimes considered a necessary element of criminal contempt. See *Threadgill v. Beard*, 225 Kan. 296, Syl. ¶ 6, 590 P.2d 1021 (1979) ("Whether a particular act or omission is contemptuous depends not only upon the nature of the act itself, but upon intent, good faith, and the surrounding circumstances.").

In his initial response to this court's Order to Show Cause, the attorney general contended that the documents attached to his brief were "but a very small fraction of the entire record before the lower court in the inquisition; we attached only what we believed necessary to support our arguments in this segment of the proceedings." As for the news conference, Kline asserted that he "stressed the privacy protections put in place by the lower court and the law to prevent public disclosure of the medical records sought. . . . I did not refer to the transcript of the lower court's hearing, nor did I provide it at the news conference. Later that day, my communications director, after our brief had been filed, provided the transcript electronically to those who requested a copy." He argued that "it was seemingly inconsistent to keep these pleadings under seal while at the same time suggesting that oral argument was likely." Kline also argued that the press conference was "necessitated by the false impression left by the public filing of Petitioners' brief and [Petitioners'] representation of the record."

Kline's initial responses were troubling. He admitted that he attached sealed court records to a brief he knew would be unsealed; that he did so knowingly because, in his sole estimation, he believed it to be necessary to further his arguments; that he held a press conference on this criminal matter merely because he determined that petitioners had painted his previous actions in an unflattering light; and that he later permitted his staff to provide electronic copies of the sealed transcript to anyone who requested them. In essence, Kline has told this court that he did what he did simply because he believed that he knew best how he should behave, regardless of what this court had ordered, and that his priorities should trump whatever priorities this court had set. Furthermore,

although there is conflict between the parties on exactly what was said in the press conference, *i.e.* whether the actual content of the sealed documents was discussed, Kline's stated reason for holding the conference — to combat what he saw as unflattering earlier press coverage — does not appear to be among the permissible reasons for an attorney in his position to engage in extrajudicial statements under Kansas Rule of Professional Conduct 3.6 (2005 Kan. Ct. R. Annot. 473). This too is troubling.

At oral argument before this court, Kline's lawyer, a former four-term attorney general, wisely altered the tone of Kline's response. He characterized whatever mistakes Kline may have made as honest ones and said his client was acting in good faith. He also, as Kline eventually had done for himself in his written response, made a classic "no harm, no foul" argument: Any disclosure of sealed material did nothing to impair the orderly nature of this proceeding or the soundness of its eventual result; the attorney general and his staff did not release information harmful to personal privacy, prejudicial to the administration of justice, or detrimental to this court's performance of its duties.

We conclude that, despite the attorney general's initial defiant tone, he should not be held in contempt at this time. No prejudice has resulted from his conduct, a distinguishing feature of the cases cited to us by petitioners. See, *e.g., United States v. Cutler,* 58 F.3d 825, 837 (2d Cir. 1995) (criminal contempt; comments willful and likely to prejudice proceedings); *United States v. Dubon-Otero,* 98 F. Supp. 2d 187, 192 (D. Puerto Rico 2000) (inherent power to sanction counsel; behavior amounted to abuse of judicial process); *In re Holley,* 285 App. Div. 2d 216, 221, 729 N.Y.S.2d 128 (2001) (disciplinary case; public censure for disclosing sealed document to journalist).

This is a highly unusual case, the first in memory when this court has required public briefs and oral argument on a sealed record. Although we believe this directive was more challenging than confusing, and although the actions complained of here might well be characterized as criminal contempt in a different case, we are inclined to grant the attorney general the benefit of the doubt here. This is an unusually high-profile case attracting keen public interest

throughout the state. We caution all parties to resist any impulse to further publicize their respective legal positions, which may imperil the privacy of the patients and the law enforcement objectives at the heart of this proceeding.

Petition for mandamus granted. Motions to Clarify Argument noted. Motion for Order Directing the District Court to Forward the Entire Inquisition Record to This Court denied.

LARSON, S.J., assigned.