NOT DESIGNATED FOR PUBLICATION

Nos. 117,520
117,521
117,523

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LONNIE BAKER,
*Appellant*,

v.

SAMANTHA ANN MARIE MILLER, et al.,
*Appellees*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; TIMOTHY G. LAHEY, judge. Opinion filed September 28, 2018. Vacated.

*Stephen L. Brave*, of Brave Law firm, LLC, of Wichita, for appellant.

*Derek H. MacKay*, of Brown & James, P.C., of Kansas City, Missouri, and *Timothy J. Wolf*, of the same firm, of St. Louis, Missouri, for appellee Samantha Ann Marie Miller.

*Samantha M. H. Woods and Stanford J. Smith*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellee Violet Cole.

Before ARNOLD-BURGER, C.J., ATCHESON, J., and LORI BOLTON FLEMING, District Judge, assigned.

ARNOLD-BURGER, C.J.: When an attorney or litigant violates an order of the court, the judge may issue an order for the attorney or litigant to show cause why he or she should not be held in indirect contempt of court. The order is issued upon the filing of

1

a motion requesting such an order accompanied by an affidavit setting forth the facts constituting the violation of the court order. K.S.A. 2017 Supp. 20-1204a(a).

In this case the district court ordered the plaintiffs' attorney, Stephen Brave, to *not* cash checks he had received as part of a settlement until the appeal of the case was complete. Brave, based on a change in his appellate strategy, cashed the checks without informing the court or the opposing parties. Defendant, Violet Cole, filed a motion requesting an order requiring Brave to appear and show cause as to why he should not be held in contempt of court. The district court granted the motion and set a show cause hearing.

After hearing the arguments of the parties, the district court held Brave in contempt of court. Ultimately, the district court imposed no monetary sanctions on Brave. Brave appeals from the ruling of contempt. We find Brave's actions violated the district court's order, but vacate the court's contempt order because Brave's actions did not prejudice the court or the parties.

FACTUAL AND PROCEDURAL HISTORY

Many of the underlying facts in this case are set out in *Farmers Insurance Company v. Miller*, No. 116,605, 2018 WL 1124131 (Kan. App. 2018) (unpublished opinion), and will not be repeated here. Suffice it to say that the underlying case involves a settlement related to a personal injury action. A dispute ensued between counsel regarding which came first, the release from the plaintiffs or the money from the defendants. It morphed into a separate lawsuit filed by the plaintiffs for breach of contract and fraud followed by motions from the defendants to enforce the settlement agreement. In the meantime, defendants sent their promised checks to the plaintiffs, although plaintiffs' counsel had not yet cashed them. At the close of a hearing on the defense motions to enforce the settlement, the court held that there had been substantial

2

compliance with the settlement agreement by the defendants, that both sides had some responsibility for the delay in obtaining payment, but that these actions were not sufficient to set aside the settlement. The judge ordered the releases signed and delivered to the defendants. Plaintiffs did not ask for interest on the settlement amount as a result of the delay but did make it clear that they would appeal the court's decision regarding the existence of a settlement agreement based upon defendants' breach.

An exchange at the heart of this case then took place between plaintiffs' counsel and District Court Judge Terry Pullman. The judge was clearly concerned that the plaintiffs had the settlement money from the defendants, but the defendants had no releases, and the plaintiffs had no plan to provide defendants releases during the pendency of the appeal because they were arguing that the settlement agreement had been breached and therefore there was no settlement.

> "[PLAINTIFFS' COUNSEL:] . . . So I don't know how we want to do that with regard to the releases. I'm going to have to post a bond on that.
>
> "THE COURT:  I'll order a stay on the $155,000 you've already received . . . . Nobody will get benefit of that pending the appeal, if you in fact do appeal. That's up to you."

Plaintiffs' attorney, Brave, also stated "[the checks] haven't been cashed, nor are they going to be cashed." Instead of a written journal entry the court prepared a minute sheet and attached the transcript.

On appeal, plaintiffs chose to abandon their argument on whether the settlement agreements were binding, instead pursuing a claim that interest was due on the settlement amount. This claim was ultimately unsuccessful. 2018 WL 1124131, at *5-6. After abandoning their argument concerning the settlement agreement, and while the appeal

3

was still pending, Brave cashed the referenced checks and placed the money in his attorney trust account. This was done with no notice to the court or the defendants.

After learning that the checks had been cashed, defendant Cole requested an order requiring plaintiffs' counsel to "appear and show cause as to why he should not be held in Contempt of Court." Cole argued that the district court ordered a stay prohibiting the checks from being cashed and that by cashing the check Brave violated the stay. The motion contained a notice of hearing.

The next day, Brave responded to Cole's motion arguing, in part, that the district court's order was not a stay on cashing the checks but instead a supersedeas bond that he was free to post or not post, at his discretion, based upon the claims he ultimately chose to pursue on appeal.

The day following Brave's response, District Court Judge William Woolley entered an order to show cause directing Brave to "show cause why he should not be held in contempt of Court as alleged in the Motion for Order to Show Cause."

Yet a third judge, District Court Judge Timothy G. Lahey, held a show cause hearing on February 24, 2017. Brave objected to the order to appear and show cause. The objection essentially argued that Brave's due process rights were violated and that the district court lacked jurisdiction. At the hearing itself, Judge Lahey heard arguments from the parties. Brave's arguments are largely the same ones made in this appeal. After hearing Brave's arguments, Judge Lahey said:

> "Well, I have to say that is the most disassembling explanation I've heard in the
> most circuitous method of trying to confuse what's a pretty straight forward issue.

4

"The purpose of civil contempt is for protection of a civil litigant. It's not keys to the courthouse. The court isn't here to vindicate the court's authority directly or to fine or to punish. I'm not here to punish anybody about anything.

. . . .

"There was a stay pretty clearly against you cashing the checks and you cashed the checks. This is a very serious matter. I'm fairly astonished by just kind of how this is all coming about. At the end of the day it is a pittance financially. I don't understand it.

. . . .

". . . I don't know how a lawyer can represent to the court they are not going to cash checks in this context and the intent of what Judge Pullman was doing was crystal clear."

Judge Lahey found Brave in contempt of court. But the court also found that the defendants suffered no harm because Brave cashing the checks coincided with the defendants' goals—affirming the enforceability of the settlement agreement. On the other hand, Judge Lahey reasoned that the defendants spent time on addressing the contempt issue and ordered Brave to pay attorney fees. Judge Lahey also informed Brave that the court was required to inform the attorney disciplinary administrator of the ruling and that he would do so.

Approximately two months later, Judge Lahey held a telephone conference with the parties about his ruling. He informed the parties that he was reversing his earlier ruling in part. Brave would no longer be required to pay attorney fees, but the court was still finding that he was in contempt of court.

Brave appeals from that ruling.

5

*Brave's due process rights were not violated by the failure to have a hearing prior to issuance of the show cause order.*

Kansas statutes regulate the district court's power to impose sanctions for contempt of court. K.S.A. 20-1201 et seq. There is no inherent power to punish for contempt independent of K.S.A. 20-1201 *et seq. In re M.R.*, 272 Kan. 1335, 1340-41, 38 P.3d 694 (2002). Any contempt order that fails to comply with the statute may be void for lack of jurisdiction. See *Padron v. Lopez*, 289 Kan. 1089, 1106-07, 220 P.3d 345 (2009) (void for lack of service of process on an order to show cause).

Kansas recognizes two types of contempt: direct and indirect. K.S.A. 20-1201. Direct contempt is contempt that occurs during the "sitting of the court or of a judge at chambers" and is not at issue here. K.S.A. 20-1202. "All others are indirect contempts." K.S.A. 20-1202.

For an individual to be found guilty of indirect contempt the court must first issue an order to appear and show cause why the individual should not be found in contempt.

> "When an order in a civil action has been entered, the court that rendered the same may order a person alleged to be guilty of indirect contempt of such order to appear and show cause why such person should not be held in contempt if there is filed a motion requesting an order to appear and show cause which is accompanied by an affidavit specifically setting forth the facts constituting the alleged violation." K.S.A. 2017 Supp. 20-1204a(a).

Contempt is also split into criminal and civil contempt.

6

> "'Civil contempt is the failure to do something ordered by the court for the benefit or advantage of another party to the proceeding.' Criminal contempt, by contrast, is 'conduct directed against the dignity and authority of a court or a judge acting judicially, with punitive judgment to be imposed in vindication; its essence is that the conduct obstructs or tends to obstruct the administration of justice.'[Citations omitted.]" *State v. Jenkins*, 263 Kan. 351, 358, 950 P.2d 1338 (1997).

Civil contempt should be a remedial or corrective action which is designed to coerce a party into action. *Jenkins*, 263 Kan. at 358.

Kansas law requires a motion to be filed "requesting an order to appear and show cause" when indirect contempt is alleged. K.S.A. 2017 Supp. 20-1204a(a). If an order is granted the order "shall state the time and place where the person is to appear." K.S.A. 2017 Supp. 20-1204a(b). Once an order is granted the "court shall hear the matter at the time specified in the order, and upon proper showing, may extend the time so as to give the accused a reasonable opportunity to purge oneself of the contempt." K.S.A. 2017 Supp. 20-1204a(b). The same provisions apply to both civil and criminal indirect contempt. K.S.A. 2017 Supp. 20-1204a(d).

There is no requirement under the statute that a hearing be held prior to the issuance of a show cause order. A person subject to a show cause order has a full opportunity to present his or her case at the show cause hearing, fulfilling any due process requirements under the United States or the Kansas Constitution. See *Kerry G. v. Stacy C.*, 55 Kan. App. 2d 246, 251, 411 P.3d 1227 (2018) (due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner). Brave was accorded a full opportunity to present his case at the February 27, 2017 hearing so we find no due process violation here.

7

*The district court erred by finding Brave to be in indirect contempt of court.*

Brave next argues that the district court erred in finding him in indirect contempt of court. An appellate court applies a de novo review to determine whether the alleged conduct is contemptuous. An abuse of discretion standard is applied in reviewing the sanctions imposed. *In re Marriage of Shelhamer*, 50 Kan. App. 2d 152, 154, 323 P.3d 184 (2014).

There is no dispute that the show cause order was for *indirect* contempt of court. No one claims Brave's actions took place in the courtroom or chambers. But in this case, Judge Lahey and the parties appear to have confused the concepts of civil and criminal indirect contempt. As indicated, "'[c]ivil contempt is the failure to do something ordered by the court for the benefit or advantage of another party to the proceeding.'" *Jenkins*, 263 Kan. at 358. If the court is seeking to enforce its orders, it is generally civil contempt. If the court is seeking to punish someone for disrespect or disobedience it is usually criminal contempt. *In re J.T.R.*, 47 Kan. App. 2d 91, 95, 271 P.3d 1262 (2012). Moreover, one faced with indirect criminal contempt is entitled to all the safeguards usually associated with a criminal charge including the right against self-incrimination, the right to counsel, a presumption of innocence, and sufficient evidence to prove guilt beyond a reasonable doubt. 47 Kan. App. 2d at 100. Because none of the pleadings or orders before the district court identify whether Brave was found in indirect civil contempt or indirect criminal contempt, it is necessary to closely examine the facts.

In her motion, Cole argued that by cashing the checks Brave not only violated Judge Pullman's stay, but he had committed a deceitful act of theft which impacted the parties as well as both the district and appellate court. He cashed checks related to a settlement agreement that—at least as far as the court and the parties knew—he was still arguing was void. So, the money was gone, no releases were provided, and the defendants were still in the process of submitting briefs related to Brave's appeal of Judge

Pullman's order. Cole did not specifically call her motion one for criminal or civil indirect contempt. However, she did request certain sanctions including the dismissal of the appeal, the delivery of the releases, a dismissal of the underlying action with prejudice and any other relief that the court should deem appropriate. The request for some sanctions that appear unrelated to remedial action seems to suggest that Cole believed this to be a criminal indirect contempt.

Judge Woolley's order to show cause did not indicate whether Brave was to defend against civil indirect contempt or criminal indirect contempt of court.

In his written response to Cole's motion, Brave argued that there is no basis in the law for a court to find an attorney in contempt for unilaterally "revoking a supersedeas bond." He also argued that because the case was on appeal, the district court had no jurisdiction to find him in contempt, that such a ruling would be up to the appellate court. Finally, he requested that the court give him a chance to purge any contempt. He pointed out that nothing prevented Cole from arguing that by cashing the checks Baker had acquiesced in the validity of the settlement agreement. He committed to provide the releases if the Court of Appeals said he had to. By mentioning an opportunity to purge the contempt, Brave seems to believe that the motion is one for civil indirect contempt.

Judge Lahey did little to clear up the matter. At the hearing, Cole argued that she had been injured because of the attorney fees she was required to pay that were associated with the cashing of the checks and the transcript fees related to transcribing Judge Pullman's order related to the stay. She pushed Judge Lahey for the imposition of sanctions of $3,900 to cover those costs. A demand for sanctions to punish Brave for his actions sounds like a criminal indirect contempt action.

Brave countered that he had changed positions in the appeal and was no longer challenging the validity of the settlement agreement. Since he believed the settlement

9

agreement was valid, there was no longer a reason for him not to cash the checks, so he did. He argued the checks were being held as a supersedeas bond and he was able to unilaterally "revoke a supersedeas bond" and such acts did not constitute contempt. Brave also pointed out that with a civil indirect contempt Judge Lahey would have to give him the "keys to the courthouse. . . . [S]anctions and attorney fees is [not] part of that." Judge Lahey himself noted that "the purpose of civil contempt is for the protection of a civil litigant." He specifically noted that the court was not there to vindicate the courts authority or to fine or punish. This would clearly seem to indicate that both Brave and Judge Lahey were viewing this proceeding as a civil indirect contempt action.

After hearing all the arguments, Judge Lahey made his decision. He made a factual finding that Judge Pullman told Brave not to cash the checks and Brave cashed the checks, regardless of whether it was called a stay or a bond. We pause to note that Brave never argued that Judge Pullman's intention was unclear. Instead he conceded that the order not to cash the checks was intended to stand in the place of a supersedeas bond—but apparently one that Brave was free to withdraw when he no longer felt it was necessary. Judge Lahey found Brave in indirect contempt of court for violating that order. He found that Brave had an obligation as an officer of the court to advise the defendants that he was changing his position in the case. But Judge Lahey went on to say that there were no "keys to the courthouse" he could give Brave to "fix it." He specifically noted that there was ultimately no harm to the defendants, because they wanted the settlement enforced and the checks cashed in the end. But then switching gears, Judge Lahey assessed $1,290 against Brave for attorney fees for the work done by Cole's counsel related to the order to show cause and the anticipated work associated with preparing the journal entry of the court's decision.

Two months later, apparently prompted by a review of the journal entry for his signature, Judge Lahey conducted a conference call with all parties. In that call, he stated that he had reconsidered his actions in the case after a review of the caselaw. He

10

concluded that payment of attorney fees did nothing to enforce Judge Pullman's order that the checks not be cashed. Instead, it appeared to be more of a punishment for Brave's actions. He noted the parties had not requested that Brave pay the money back, which would be the "keys to the courthouse" that would allow Brave to purge himself of any contempt. He suggested that the defendants did not make that request because it was ultimately to their benefit that Brave cashed the checks. The only harm defendants suffered was the failure to get a release, which Judge Pullman concluded would be properly addressed in the appeal. He also noted that Brave was entitled to be put on notice of the type of relief that was being requested and that was not done here.

In his final journal entry, Judge Lahey described Brave's failure to obey the court's order not to cash the checks as an indirect civil contempt action. He found that the order was clearly put in place to try to protect the defendants from the plaintiffs receiving the benefit of the settlement agreement, while continuing to argue on appeal that the settlement agreement was void. He set aside the sanctions he imposed because he believed them to be punitive in nature and not meant to allow Brave to purge himself of the contempt. He also noted the lack of sufficient notice for the monetary sanctions he imposed. That is not to say that the court could not have treated it as an indirect criminal contempt if the proper notices had been given. Our Supreme Court has held that violation of a court order can be the basis for a finding of indirect criminal contempt. See *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 927, 128 P.3d 364 (2006). We are merely examining what Judge Lahey believed he was doing based on the comments he made and the actions he took.

Because there were no sanctions imposed, we are left to determine de novo whether Brave's failure to obey Judge Pullman's order not to cash the checks justified a finding of indirect civil contempt. See *In re Marriage of Shelhamer*, 50 Kan. App. 2d at 154-55 (appellate court conducts a de novo review to determine whether the alleged

11

conduct is contemptuous). So we turn next to an examination of the evidence of indirect civil contempt.

We have no trouble finding, as did Judge Lahey, that regardless of whether Judge Pullman's order was characterized as a stay or a supersedeas bond, he ordered that the checks not be cashed before the appeal was final. Brave failed to follow that order by cashing the checks. If Brave had decided to abandon the appellate argument that was the basis for the court's order, he had a duty to request permission from the court, with notice to the parties, to cash the checks. His failure to do so was a clear violation of a court order. But that does not end our analysis.

We look not only at whether a particular act or omission is contemptuous, but upon the surrounding circumstances to determine if a finding of contempt is in order. See *Threadgill v. Beard*, 225 Kan. 296, Syl. ¶ 6, 590 P.2d 1021 (1979). The Kansas Supreme Court has suggested that to find a party in indirect contempt there must be some prejudice. *Alpha Med. Clinic*, 280 Kan. at 929. This is consistent with the general rule that a finding of civil indirect contempt is meant to be remedial in nature. To remedy means to correct a wrong. Webster's New World College Dictionary1228 (5th ed. 2014). Accordingly, to be remedial there must be a wrong or injury to correct and a means to correct it.

Judge Lahey made an unequivocal finding that there was no prejudice or harm as a result of Brave's actions and we agree. The defendants did not request that the money be returned—which would be the means to remedy Brave's violation of the court order, because it turned out to be to their advantage that Brave cashed the checks. Without a wrong or harm to the court or the parties to remedy, there can be no finding of indirect civil contempt. See *Jenkins*, 263 Kan. at 358. (civil contempt should be a remedial or corrective action which is designed to coerce a party into action). Accordingly, we vacate the district court's finding of contempt against Brave.

We conclude with two final observations. First, we understand Judge Lahey's frustration with attorney Brave's conduct in this case. Regardless of whether the actions could be classified as contempt of court, Judge Lahey was well within his professional responsibilities as a judge to report Brave's violation of a court order to the disciplinary administrator. See Kansas Code of Judicial Conduct, Canon 2, Rule 2.15(B) and (D) (2018 Kan. S. Ct. R. 445) (judge has duty to report any lawyer that the judge knows or has information indicating has committed a violation of the Kansas Rules of Professional Conduct); Kansas Rules of Professional Conduct (KRPC) Rule 3.4(c) (2018 Kan. S. Ct. R. 347) (lawyer shall not knowingly disobey the rules of a tribunal); KRPC Rule 8.4(g) (2018 Kan. S. Ct. R. 381) (lawyer shall not engage in any conduct that adversely reflects on the lawyer's fitness to practice law). The contempt statute does not contain a reporting requirement in this circumstance. See K.S.A. 2017 Supp. 20-1204a(f) (contempt related to a *child support* matter may be reported to disciplinary administrator). Because Judge Lahey's professional reporting responsibilities exist separate from the contempt statute, we do not deem his decision to file a report with the disciplinary administrator as a separate and independent sanction for contempt.

Second, some of the confusion in this case can be traced to the fact that Judge Lahey was attempting to interpret the meaning of Judge Pullman's order. We suggest that when possible, the judge that issued the order that is subject to a contempt citation be the same judge that issues the show cause order and conducts the show cause hearing. The issuing judge is aware of the history and context of the order. Our position is consistent with K.S.A. 2017 Supp. 20-1204a(a) providing that the "court that rendered" an underlying order may address contempt allegations regarding that order. See also *Alpha Med. Clinic*, 280 Kan. at 927 (any claim that attorney violated a judge's order must be presented to the judge, not the Supreme Court, citing K.S.A. 20-1204a[a]). Failing to follow such a practice places both the parties and the judge in a difficult position. So assuming, without deciding, that K.S.A. 2017 Supp. 20-1204a(a) permits the practice followed here, we strongly discourage it.

13

Contempt finding vacated.

* * *

ATCHESON, J., concurring:  The Sedgwick County District Court's order finding Stephen Brave in civil contempt should be set aside, so I concur in the result the majority reaches. But I disagree with my colleagues' principal factual and legal determinations supporting that result. The majority erroneously finds Judge Pullman ordered Brave not to cash the settlement checks. And in reaching its legal conclusion, the majority applies a strange test that incorrectly incorporates prejudice as a key component in weighing a contempt citation. As I explain, the purpose of civil contempt is to coerce a recalcitrant party to comply with a court order through pressure applied, typically in the form of incarceration or recurring fines, until there is compliance. So even if Brave had been ordered not to cash the checks, he could not have been held in civil contempt after cashing them. At that point, his compliance could not be compelled, since he already would have violated the order in a way that left it nugatory. What Brave did may well have warranted various types of formal condemnation and correction. But civil contempt is not among them.

Let me begin with a discussion of the salient facts:

• Brave represented three persons in consolidated actions to recover for injuries they received as passengers in a single-car crash. On their behalf, Brave sued Samantha Miller, the driver of the rental car, and Violet Cole, who had obtained the car for Miller, her great-granddaughter. Cole had insurance policies with both Allstate and Farmers that may have afforded coverage. Miller and Cole each had a set of lawyers hired by the insurance companies to defend them. From what we have in front of us, the relationship between Brave, on the one hand, and the defense lawyers, on the other, devolved into continually simmering antipathy. The relationship between Brave and Cole's lawyers

14

became particularly toxic. I can't tell why just about every semblance of professional courtesy evaporated. Apart from the personal injury actions, the crash spawned suits regarding coverage that almost certainly kept things heated up.

• Brave and the lawyers for Miller and for Cole ostensibly reached a settlement agreement to which Allstate and Farmers would contribute equally. Based on the appellate record, Brave and the defense lawyers concluded Allstate's part of the settlement with no major problems. Not so with Farmers. Brave and the defense lawyers got into an extended hissy over exchanging settlement checks from Farmers for signed releases from the plaintiffs. Neither side wanted to be the first to tender performance, and for some reason they couldn't work out a simultaneous exchange. The delay prompted Brave to suggest the settlement had failed or that Cole and Miller should pay interest on the agreed upon amount. Cole's lawyers countered with a motion to enforce the agreement. In the midst of that swashbuckling in July 2016, Brave received three Farmers' checks in a total amount of $155,000, representing the bulk of the remaining settlement amount.

• At a hearing about a month later, Judge Pullman considered the competing motions on whether the lawyers had reached a settlement. During the argument, one of the defense lawyers suggested Brave couldn't very well assert the absence of a settlement while retaining the settlement checks. Brave countered that the checks "were evidence" bearing on the dispute, and he assured Judge Pullman that they "haven't been cashed, nor are they going to be cashed." Brave never explained why, as an evidentiary matter, he needed to retain the original checks.

Judge Pullman ruled Brave and the defense lawyers had reached an enforceable settlement on behalf of their clients and ordered both sides to fulfill their obligations under the agreement. That required Brave to provide signed releases and to dismiss the personal injury actions against Miller and Cole. Brave said he intended to appeal the

15

ruling. In discussing the mechanics of the appeal and how to put the settlement on hold awaiting a ruling from this court, Brave suggested he would have to post a supersedeas bond. Whether a bond would be required or in what amount presents another debatable legal proposition, especially given the issue and the lack of any money judgment against Brave's clients. See K.S.A. 2017 Supp. 60-2103(d). In response, Judge Pullman stated: "I'll order a stay on the $155,000 you've already received relative to Ms. Cole as well. Nobody will get benefit of that pending the appeal, if you in fact do appeal." He did not order a bond be posted.

No one prepared a proposed order or journal entry. The lawyers told Judge Pullman they hadn't been able to agree on journal entries earlier in the case and presumed they would be no more successful this time. They said a minute order acknowledging the hearing and incorporating the transcript would be satisfactory. Judge Pullman followed that course and simply noted that the motion to enforce the settlement had been granted as set forth in the record.

As the transcript shows, Judge Pullman never ordered Brave not to cash the settlement checks from Farmers. The defense lawyers characterized the ruling as prohibiting Brave from cashing the checks when they sought to have him held in contempt and have repeated their characterization on appeal. The majority accepts that spin on the order. Judge Pullman actually ordered that no one have the benefit of the $155,000 Brave had received as the settlement progressed. That's different from ordering the checks from Farmers not be cashed. As the lawyer for Cole acknowledged at oral argument, Brave would not have violated the order if he had deposited the checks in his trust account and then presented a trust account check for $155,000 to the clerk of the district court so the funds could be held in the court registry to be disbursed upon further order. Judge Pullman ordered a stay on the disbursement of the settlement funds to Brave or his clients, not on negotiation of the checks. Not cashing Farmers' checks simply would have been one way, among others, of complying with Judge Pullman's order.

16

• Farmers issued the checks in early July 2016, and the checks stated they were valid for six months. See K.S.A. 84-4-404 (bank not obligated to pay check presented more than six months after it is dated). In mid-December, shortly before the checks were to expire, Brave did have his clients endorse them and (so far as the record indicates) deposited them in his trust account, where the funds remained. Brave did so without notice to the defense lawyers and without permission of the district court. The defense lawyers learned Brave had cashed the checks when Farmers received the cancelled checks and asked about the status of the case.

• The lawyers for Cole filed a motion for a hearing to have Brave held in contempt of court for cashing the checks. The motion did not identify whether they sought a civil or criminal contempt finding against Brave. And the motion requested various forms of relief, such as dismissal of the underlying personal injury actions, that could not have been granted for either criminal or civil contempt of court. Judge Woolley issued a show-cause order and set a hearing date. The order did not identify whether Brave faced civil or criminal contempt.

On appeal, Brave has attacked the motion and show-cause order for various purported deficiencies. Although there may be problems with the sufficiency of the notice, I skip over the issue because there are more direct reasons the civil contempt finding against Brave must be set aside.

• Judge Lahey heard the contempt proceeding, even though he had no earlier involvement in the case. Neither Brave nor the lawyers for Miller or Cole offered testimony at the hearing. They made various factual representations and legal arguments to Judge Lahey. And Judge Lahey took notice of the contents of the court file. Brave contended that Judge Pullman's stay on the settlement proceeds amounted to a supersedeas bond. Brave argued that when he decided to limit the appeal to whether his clients were entitled to interest on the settlement amount because of Farmers' delay—

17

abandoning the claim there had been no enforceable settlement—he could cash the checks because a bond was no longer necessary.

Judge Lahey properly discounted Brave's argument. First, Judge Pullman neither ordered a supersedeas bond nor stayed use of the $155,000 as the equivalent of a bond. See K.S.A. 2017 Supp. 60-2103(d)(2)(C) (court need not set bond in statutorily presumptive amount); *Cimarron Feeders v. Bolle*, 28 Kan. App. 2d 439, 450, 17 P.3d 957 (2001) (court has authority to regulate execution on judgment even absent supersedeas bond). The lawyers for Miller and Cole never petitioned for a supersedeas bond. So the premise of Brave's position appears faulty. Second, even if there were a bond or the stay actually substituted for a bond, Brave almost certainly could not have unilaterally cancelled a bond or disregarded the stay simply because he had decided to pursue a narrow appeal that effectively conceded a valid settlement. He should have notified the other parties and gotten approval of the district court. What Brave claims he did would have been inappropriate in the circumstances he portrayed to Judge Lahey.

In a detailed written ruling, Judge Lahey found Brave violated the stay by cashing the checks—a doubtful proposition, since that's not what Judge Pullman ordered. It's what Brave volunteered. Brave may have been guilty of going back on his representation to the other lawyers and Judge Pullman, but that's not the same as violating a court order that required something else.

Judge Lahey, nonetheless, found Brave in indirect civil contempt, although he recognized he could fashion no appropriate relief. As I explain, the purpose of civil contempt is to compel a party to abide by a court order going forward. If, as Judge Lahey found, Brave had been ordered not to cash the checks, then Judge Lahey had no way to compel Brave not to cash them after he had already done so. Under the circumstances, Brave could not have been held in civil contempt, since complying with an order not to cash the checks had become an impossibility. See *Lamberson v. Lamberson*, 164 Kan. 38,

43, 187 P.2d 366 (1947) (party cannot be jailed for civil contempt to force compliance with an order when party is "powerless to comply").

Having outlined the facts, I turn to the law governing contempt of court. There are four categories of contempt of court that overlap. Contempt can be either direct or indirect and either civil or criminal. *In re J.T.R.*, 47 Kan. App. 2d 91, 96, 271 P.3d 1262 (2012). Direct contempt entails contumacious or disrespectful conduct in the court's presence. Indirect contempt occurs outside the court's presence and typically involves the willful refusal to obey a court order, a form of contumacy. Each may be treated as a civil contempt or a criminal contempt in fashioning a remedy. Civil contempt aims to compel a delinquent party to comply with a court order in the future. Upon a finding of civil contempt, a court may jail a recalcitrant party for an indefinite period until he or she agrees to comply with the order. The court may instead choose to impose a periodic fine—daily or weekly, for example—or some other coercive sanction until the party complies. Criminal contempt punishes a party for a past violation of an order with a fixed fine or jail sentence as a penalty. Criminal contempt then vindicates a court for a party's past violation of an order rather than seeking the party's future compliance with the order. See *In re Marriage of Shelhamer*, 50 Kan. App. 2d 152, 155-56, 323 P.3d 184 (2014) (discussing direct and indirect contempt and civil and criminal remedies); *In re J.T.R.*, 47 Kan. App. 2d at 95-96. Sometimes, a party may be subject both to civil contempt to secure future compliance and to criminal contempt to punish past dereliction. See *State v. Revels*, 793 S.E.2d 744, 748-49 (N. C. App. 2016) (trial court properly considered and imposed civil and criminal contempt in single hearing, although different procedural rules applied to each). Particularly pertinent here, in either civil or criminal contempt, the underlying court order must be sufficiently clear and specific that the parties may reasonably determine what it requires. *Lamberson*, 164 Kan. 38, Syl. ¶ 2; *Ensch v. Ensch*, 157 Kan. 107, 115-16, 138 P.2d 491 (1943); *In re Marriage of Arvidson*, No. 105,421, 2012 WL 1649838, at *11 (Kan. App. 2012) (unpublished opinion).

19

Civil contempt—a party's contumacious refusal to do what a court has ordered— must be proved by clear and convincing evidence. 17 C.J.S. Contempt § 146 (2018); 17 Am. Jur. 2d Contempt § 180 (2018). Criminal contempt, however, invokes greater protections available to all defendants facing criminal prosecution: proof beyond a reasonable doubt; a presumption of innocence; the right to counsel; the right against self-incrimination; and presumably the right to jury trial if the punishment will exceed six months in jail. *In re J.T.R.*, 47 Kan. App. 2d at 99-100; 17 C.J.S. Contempt § 145 (2018); 17 Am. Jur. 2d Contempt § 180 (2018). An appellate court reviews an affirmative finding of contempt without deference to the district court but examines the remedy for abuse of discretion. *In re M.R.*, 272 Kan. 1335, 1342, 38 P.3d 694 (2002); *Shelhamer*, 50 Kan. App. 2d at 154-55.

Everybody agrees that any contempt on Brave's part must have been indirect rather than direct, since it turned on his handling of the checks from Farmers. The record shows that Brave negotiated the checks shortly before they were to expire and deposited the $155,000 in his law firm's trust account. Although that was contrary to his representations in the district court as to how he would handle the checks, it is hardly a clear violation of Judge Pullman's order that no one "will get [the] benefit of" the $155,000 during the appeal. A lawyer who receives funds belonging to a third party is supposed to hold that money in a trust account separate from any firm operating account or a personal account. See Kansas Rules of Professional Conduct 1.15(a) (2018 Kan. S. Ct. R. 328). Here, the $155,000 still belonged to Farmers as long as the settlement remained unresolved. Until the settlement was finalized, Brave had not earned any fees that could be taken from the $155,000. Nor could he release any money to his clients. After depositing the money in his trust account, Brave was obligated to "hold that property with the care of a professional fiduciary" acting on behalf of Farmers. KRPC 1.15, Comment 7. Consistent with that fiduciary duty, Brave could not have disbursed the money to himself or his clients without the consent of Farmers or a court order.

So there is a sound argument that Brave's actions conformed to Judge Pullman's order while deviating from his representations at the hearing on the motion to enforce the settlement agreement. I view the record and the law that way. Given the acrimony that pervaded the underlying personal injury action, Farmers and its lawyers understandably may have been uneasy with the $155,000 residing in Brave's trust account. Once the checks were negotiated, they lost direct control over the money and were dependent upon Brave fulfilling his fiduciary duty to them and complying with Judge Pullman's order. But that trepidation would not have been a legal basis to find Brave in contempt of court, since he appears to have complied with Judge Pullman's order. Rather than filing a motion for contempt, the defense lawyers could have requested that Judge Pullman revise his order to require Brave to return the $155,000 to Farmers or to deliver the funds to an independent escrow agent, such as the clerk of the district court, during the appeal.

In short, the record fails to establish by clear and convincing evidence that Brave violated Judge Pullman's order—the standard required for civil contempt. Clear and convincing evidence must show the requisite facts to be highly probable, imposing a higher burden than more probably true than not but not as high as beyond a reasonable doubt. *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶¶ 2-3, 187 P.3d 594 (2008). What Brave did was not obviously at odds with Judge Pullman's order and looks to be consistent with it. The order, as a pronouncement from the bench, was cast in general terms that did not explicitly (or, really, implicitly) forbid negotiation of the checks so long as the funds were not paid out to Brave or his clients for their immediate use. For that reason, I would conclude that the district court erred in finding Brave in indirect civil contempt.

The majority offers two specious reasons supporting its premise that Judge Pullman forbade the cashing of the settlement checks, even though he said no such thing. First, the majority points out Judge Lahey made a finding that Judge Pullman ordered Brave not to cash the checks. But that proves too little. There is no dispute about what Judge Pullman said. The transcript indisputably depicts his words. We can determine the

21

legal import of those words just as well as Judge Lahey could, so we owe no deference to his conclusion. See *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 258-59, 261 P.3d 943 (2011) (legal effect of undisputed facts question of law decided without deference to district court).

If we were to consider Judge Lahey's conclusion purely as a fact determination as to what Judge Pullman said rather than for the legal significance of the statement, then the determination was clearly erroneous and should be disregarded for that reason. See K.S.A. 2017 Supp. 60-252(a)(5) (district court's findings of fact may not be set aside unless "clearly erroneous"); *City of Topeka v. Estate of Mays*, 245 Kan. 546, 549, 781 P.2d 721 (1989) (citing K.S.A. 60-252). In short, paraphrasing Judge Pullman's order as the defense lawyers and Judge Lahey have alters the meaning of the words and imputes a mandatory prohibition on cashing the checks that is not otherwise required by a fair reading of those words.

Second, the majority infers that Brave thought Judge Pullman had ordered him not to cash the checks. Brave has never directly argued otherwise. But the inference, even if correct, also proves too little. A party cannot be held in indirect civil or criminal contempt for engaging in behavior he or she *mistakenly* believes disregards or violates a court order. The intent may be bad, but the result doesn't amount to contempt of court. So Brave could not have been cited for contempt because he cashed the settlement checks and held the proceeds in his trust account—conduct consistent with Judge Pullman's order—even if he intended to strike a rebel blow in defiance of the order.

Assuming I am mistaken and Brave actually violated Judge Pullman's order by cashing Farmers' checks, he still could not have then been held in civil contempt. As I have already outlined, civil contempt entails the imposition of sanctions designed to coerce a party to comply with a court order. If Judge Pullman's order prohibited cashing the checks, no sanctions could have forced Brave to comply after he had already cashed

22

the checks. The performance of a discrete prohibited act renders compliance with the order prohibiting that act an impossibility no matter how coercive the sanctions. Civil contempt simply does not lie in that situation. But a party doing what he or she had been ordered not to do could face an indirect criminal contempt citation. Judge Lahey did not find Brave guilty of criminal contempt, so I don't need to delve into that scenario. The heightened evidentiary and procedural requirements for criminal contempt would seem to present formidable obstacles here, at least on cursory review.

All of that is sufficient to set aside the indirect civil contempt finding against Brave. My conclusion would not spare Brave other sanctions for the measurable gap between his representations about the settlement checks in the hearing with Judge Pullman and his later contrary actions. But it is not my business in this appeal to assay possible transgressions or consequences.

Finally, I respectfully disagree with the majority's specific reasoning in setting aside the civil contempt finding. According to the majority, the Kansas Supreme Court "suggested" in *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 929, 128 P.3d 364 (2006), that a party's actions have to cause some form of prejudice to support a citation for either indirect civil or criminal contempt. In turn, the majority cites Judge Lahey's implicit conclusion that Brave's decision to cash the checks did not prejudice the defendants or Farmers and then uses that as the legal fulcrum to vacate the contempt citation. But *Alpha Med. Clinic* does not advance the idea that prejudice must infuse indirect civil or criminal contempt. In short, the majority mistakenly mills a new legal component for proving indirect contempt.

The Kansas Supreme Court itself flagged *Alpha Med. Clinic* as "a highly unusual case." 280 Kan. at 929. Indeed, the case was. Phil Kline, then Kansas attorney general, opened an inquisition and subpoenaed patient records from two medical clinics performing abortions. The clinics filed an original action in mandamus in the Kansas

23

Supreme Court after the Shawnee County District Court declined to dismiss the subpoenas and announced it would make a confidential inspection of the records. The Kansas Supreme Court entered an initial order sealing all filings in the case and a later order directing the briefs to be submitted as public documents while maintaining the confidentiality of the record, including the transcript of the district court hearing. Despite those orders, Kline attached portions of the sealed record to his brief to the Kansas Supreme Court and later discussed and distributed the brief and its attachments at a press conference.

The Kansas Supreme Court weighed whether to cite Kline for indirect criminal contempt for those actions as violations of its own orders. In declining to do so, the court noted both the difficulties the parties faced in drafting "public briefs . . . on a sealed record" and that "[n]o prejudice has resulted from [Kline's] conduct." The court concluded: "[A]lthough the actions complained of here might well be characterized as criminal contempt in a different case, we are inclined to grant the attorney general the benefit of the doubt here." 280 Kan. at 929. The court considered the lack of prejudice to be one factor, among others, militating against finding Kline in criminal contempt in the particular and distinctly uncommon circumstances of that proceeding. But the court most certainly did not suggest or pronounce prejudice to be a material component of civil or criminal contempt generally. Nor did the court predicate its decision on such a notion.

Often, of course, a party's refusal to obey a court order will result in an actual detriment (or prejudice) to another party in the litigation. So prejudice may be common in most indirect civil or criminal contempt proceedings. But that would not always be true. For example, had Judge Pullman ordered that nobody was to have the benefit of the settlement proceeds and that Brave was to deliver the checks to the clerk of the district court during the appeal, neither the defendants nor Farmers would have been prejudiced in any direct legal way if Brave deliberately kept the checks. Surrender of the checks would have been a redundant safeguard against Brave prematurely appropriating the

24

settlement funds for his or his clients' benefit. Even so, the district court could have cited *Brave* for either indirect civil or criminal contempt based on his refusal. A civil contempt would impose a continuing coercive sanction aimed at getting him to turn over the checks. And the criminal contempt would have imposed a fixed punitive sanction for his past refusal to do so. The majority's approach presumably would (or at least could) preclude both, since Farmers and the defendants could demonstrate no actual prejudice. I don't believe *Alpha Med. Clinic* supports that concept or that result. An indirect contempt proceeding rests on the *violation* of a court order, not on prejudice resulting from a violation. See K.S.A. 2017 Supp. 20-1204a(a).

The majority tries to buttress its reliance on prejudice by citing *Threadgill v. Beard*, 225 Kan. 296, 590 P.2d 1021 (1979), for the proposition that surrounding circumstances may inform whether a party has in engaged indirect civil or criminal contempt. In *Threadgill*, the court pointed out that a person's actions typically must be intentional and willful to be contemptuous. A court considering a contempt citation should weigh the nature of the conduct, the party's good or bad faith and intent, and "the surrounding circumstances" in assessing willfulness. 225 Kan. at 304. The court simply recognized the common evidentiary rule that a party's state of mind may be proved through circumstantial evidence. See *State v. Griffin*, 279 Kan. 634, 638, 112 P.3d 862 (2005) ("Intent, a state of mind at the time an offense is committed, does not need to be and rarely can be directly proven."); *Ball v. Credit Bureau Services, Inc.*, No. 111,144, 2015 WL 4366440, at *9 (Kan. App. 2015) (unpublished opinion). So *Threadgill* speaks to proving the intent animating the conduct and not the effects of the conduct.

The majority then reasons that in the absence of prejudice, there can be no "wrong or harm . . . to remedy," making indirect civil contempt inapposite. But that conceit also seems off the mark. A party's contumacious refusal to do what a court has lawfully ordered necessarily entails a wrong—if only in the form of renegade defiance of judicial authority. Still, were such defiance largely immune to correction, it likely would become

25

routine, and the judicial process would cease to function fairly or effectively. Civil and criminal contempt, among other types of sanctions, check those deleterious impulses. Again, assuming Brave willfully defied Judge Pullman's order by cashing the checks, there was a wrong. As I have said, citing Brave for indirect civil contempt would have afforded no remedy, since the checks could not have been "uncashed." The district court, however, could have ordered Brave to turn over the $155,000 to Farmers or to an escrow agent. And Brave could have been cited for indirect civil contempt had he then refused to obey that order.

Clearing away all of the legal underbrush, indirect civil contempt doesn't fit the circumstances of this case and Brave's challenged actions. So I agree the contempt citation should be set aside.